1  MATT O'MALLEY (SBN 272802)
2  PATRICK MCDONOUGH (SBN 288285)
   San Diego Coastkeeper
   2825 Dewey Rd # 207
3  San Diego, CA 92106
   Ph: 619-758-7743
4  Email: matt@sdcoastkeeper.org

5  COAST LAW GROUP, LLP
   MARCO A. GONZALEZ (SBN 190832)
6  LIVIA BORAK BEAUDIN (SBN 259434)
   1140 South Coast Highway 101
7  Encinitas, CA 92024
   Ph: (760) 942-8505
8  Fx: (760) 942-8515
   email: marco@coastlawgroup.com

9

10              **UNITED STATES DISTRICT COURT**

11            **SOUTHERN DISTRICT OF CALIFORNIA**

12  SAN DIEGO COASTKEEPER, a non-profit     Civil Case No.  **'19CV0565 BEN WVG**
13  corporation; COASTAL
    ENVIRONMENTAL RIGHTS                     **COMPLAINT FOR**
14  FOUNDATION,                              **DECLARATORY AND**
                                             **INJUNCTIVE RELIEF AND CIVIL**
15  a non-profit corporation,                **PENALTIES**

16

17            Plaintiffs,                    **(Federal Water Pollution Control Act,**
         v.                                   **33 U.S.C. § 1251 *et seq.*)**
18

19  HANSON AGGREGATES PACIFIC
    SOUTHWEST, INC., a Delaware
20  corporation,

21            Defendant.

22

23

24

25

26

27

28

Complaint

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.    JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). See 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.     Plaintiffs have issued three 60-day notice letters ("Notice Letters") to Defendant Hanson Aggregates Pacific Southwest, Inc. ("Hanson" or "Defendant"), and/or Hanson Aggregates LLC, owner and operator of three separate industrial facilities[1], regarding Defendant's violations of the Clean Water Act; California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*) ("General Industrial Permit"); and the San Diego Regional Water Quality Control Board's ("Regional Board") Order No. R9-2014-0041, Conditional Waiver of Waste Discharge Requirements for Low Threat Discharges in the San Diego Region ("Conditional Waiver"). The Notice Letters informed Hanson of Plaintiffs' intention to file suit against Hanson to enforce the Clean Water Act, General Industrial Permit, and Conditional Waiver. Plaintiffs issued Notice Letters to Hanson's

---

[1] Hanson Aggregates LLC is named as the operator of the three facilities at issue in several documents such as the Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI"). However, Plaintiffs are informed, believe and therefore allege that Hanson Aggregates Pacific Southwest, Inc., a Delaware corporation, is in charge of operations at the three facilities at issue in the instant Complaint, and as a result Hanson Aggregates Pacific Southwest, Inc. is the appropriately named Defendant in the instant matter.

ready-mix concrete and composting industrial facility located at 12560 Highway 67, Lakeside, CA 92040 ("Slaughterhouse Facility") on December 12, 2017; to Hanson's ready-mix concrete industrial facility located at 601 W. 12th Street, National City, CA 91950 ("National City Facility") on June 27, 2018; and to Hanson's ready-mix concrete industrial facility located at 9229 Harris Plant Rd, San Diego, CA 92145 ("Miramar Facility") on January 18, 2019. True and correct copies of the three Notice Letters, and all included enclosures, are attached hereto as Exhibit A and incorporated herein.

3.     Plaintiffs also sent the Notice Letters to the registered agents for Defendant, the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Board as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

4.     More than sixty (60) days have passed since the Notice Letters were served on Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letters and in this complaint. See 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

5.     Venue is proper in the Southern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

## II.     <u>INTRODUCTION</u>

6.     Plaintiffs seek relief for Defendant's substantive and procedural violations of the General Industrial Permit and the Clean Water Act resulting from Defendant's activities at its Slaughterhouse, National City, and Miramar Facilities (collectively "Hanson Facilities").

7.     Specifically, Defendant has discharged and/or continues to discharge

Complaint                                    2

polluted storm water from the Slaughterhouse Facility to San Vicente Creek, the San Diego River, and the Pacific Ocean; from the National City Facility to San Diego Bay and the Pacific Ocean; and from the Miramar Facility to San Clemente Canyon Creek, Rose Creek, Mission Bay, and eventually the Pacific Ocean in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1301,1342.  Defendant has also violated and continues to violate the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Industrial Permit.

8.    This complaint further seeks relief to prevent discharges in violation of the General Industrial Permit as amended by *Order No. 2014-0057-DWQ* ("2015 Permit"). These are ongoing and continuous violations of the Clean Water Act and the General Industrial Permit.

9.    With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations conducted at the Hanson Facilities, flow into storm drain systems, local tributaries, San Vicente Creek, San Clemente Canyon Creek, Rose Creek, the San Diego River, Mission Bay, San Diego Bay, and the Pacific Ocean (collectively "Receiving Waters").

10.    Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of bird, and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

11.    This discharge of pollutants in storm water from industrial activities at the Hanson Facilities contributes to the impairment of downstream Receiving Waters and compromises or destroys their Beneficial Uses.

12.    Plaintiffs seek a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's repeated and ongoing violations of the Clean Water Act and the General Industrial Permit.

Complaint                                3

## III.    **PARTIES**

### A.    **Plaintiffs.**

13.    Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 2825 Dewey Road, Suite 207, San Diego, California 92106.

14.    San Diego Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation. Coastkeeper implements this mission through outreach and education programs that work to prevent water pollution, as well as community activism, participation in governmental hearings, and prosecuting litigation to ensure that San Diego's beaches, bays, coastal waters, and tributary streams and rivers meet all substantive water quality standards guaranteed by Federal, State and local statutes and regulations. When necessary, Coastkeeper directly initiates enforcement actions on behalf of itself and its members.

15.    Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located at 1140 South Coast Highway 101, Encinitas California, 92024.

16.    CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to aggressively advocate, including through litigation, for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

17.    Plaintiffs have thousands of members who live and/or recreate in and around the Receiving Waters.  Plaintiffs' members use and enjoy San Vicente Creek, San Clemente Canyon Creek, Rose Creek, San Diego River, Mission Bay, San Diego Bay, and the Pacific Ocean to fish, sail, boat, kayak, paddle board, surf, swim, hike, view

wildlife and scenery, and engage in scientific studies, among other activities.

18.     Defendant's failure to comply with the procedural and substantive requirements of the General Industrial Permit and the Clean Water Act results in discharges of polluted storm water to the Receiving Waters. Defendant's polluted discharges degrade water quality and harm aquatic life in the Receiving Waters, and thus impair Plaintiffs' members' use and enjoyment of those waters.

19.     The violations of the General Industrial Permit and Clean Water Act at the Hanson Facilities are ongoing and continuous. Thus, the interests of Plaintiffs' members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the General Industrial Permit and the Clean Water Act.

20.     The relief sought herein will redress the harms to Plaintiffs' members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

**B.     The Owner and/or Operator of the Hanson Facilities.**

21.      Plaintiffs are informed and believe that Hanson Aggregates Pacific Southwest, Inc. is a Delaware corporation.

22.     Counsel for Defendant has informed Plaintiffs that Hanson Aggregates Pacific Southwest, Inc. is the owner and/or operator of the Slaughterhouse Facility, located at 12560 Highway 67, Lakeside, CA 92040; the National City Facility, located at 601 W. 12th Street, National City, CA 91950; and the Miramar Facility, located at 9229 Harris Plant Rd, San Diego, CA 92145.

23.     Plaintiffs refer to the Slaughterhouse Facility Owner and/or Operator, the National City Facility Owner and/or Operator, and the Miramar Facility Owner and/or Operator collectively as the "Hanson Facilities Owners and/or Operators."

/././

/././

/././

## IV.    LEGAL BACKGROUND

### A.    The Clean Water Act.

24.    The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by a NPDES permit. 33 U.S.C. § 1311(a); see 40 C.F.R. § 122.26(c)(1).

25.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated Sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

26.    "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

27.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); see 40 C.F.R. § 122.2.

28.    The EPA promulgated regulations defining "waters of the United States." See 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce.

29.    The Clean Water Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. See *Rapanos v. United States*, 547 U.S. 715 (2006); see *also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

30.    A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the

Complaint                                    6

chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

31.    A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

32.    Section 301(b) requires that, by March 31, 1989, all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable (BAT) for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology (BCT) for conventional pollutants. See 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

33.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." See 33 U.S.C. §§ 1365(a)(1) and 1365(f).

34.    Each Hanson entity is a "person" within the meaning of Section 502(5) of the Clean Water Act. See 33 U.S.C. § 1362(5).

35.    An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. See 33 U.S.C. § 1365(a).

36.    Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day per violation for all violations occurring between January 28, 2009 and November 2, 2015, and $54,833 for violations occurring after November 2, 2015. (33 U.S.C. § 1319(d); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §19.4)

37.    Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing, or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B.    California's General Industrial Permit.**

38.    Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

39.    Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *Id.*

40.    California is a state authorized by the EPA to issue NPDES permits.

41.    In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

42.    The General Industrial Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA that regulates the discharge of pollutants from industrial sites. 33 U.S.C. § 1342.

43.    Between 1997 and June 30, 2015, the General Industrial Permit in effect was Order No. 97-03-DWQ ("1997 Permit").

44.    On July 1, 2015, pursuant to Order No. 2014-0057-DWQ ("2015 Permit"), the reissued General Industrial Permit took effect.

45.    The 2015 Permit supersedes the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit.

46.    In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the General Industrial Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 1997 Permit, Finding 2; 2015 Permit § I.A.12. Prior to beginning industrial operations, dischargers are required to

Complaint                                        8

apply for coverage under the General Industrial Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. 1997 Permit, Finding 3; 2015 Permit § I.A.17.

47.    Violations of the General Industrial Permit are violations of the Clean Water Act. 1997 Permit § C.1; 2015 Permit § XXI.A.

## C.    The General Industrial Permit Discharge Prohibitions and Effluent Limitations.

48.    The General Industrial Permit contains certain absolute prohibitions. The Discharge Prohibitions provisions prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by a NPDES permit, to the waters of the United States. 1997 Permit § A.1; 2015 Permit § III.B. These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. 1997 Permit § A.2; 2015 Permit § III.C.

49.    The General Industrial Permit Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 1997 Permit § B.3; 2015 Permit § V.A.

50.    Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

51.    Pursuant to the CWA and the General Industrial Permit, dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and

Complaint                                  9

BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 Permit § V.A.

52.   The EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

53.   The EPA Benchmarks provide a relevant and objective standard for evaluating whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. See MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); MSGP, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000); see also 2015 MSGP Fact Sheet, p. 50; EPA 2008 MSGP Fact Sheet, p. 106.

54.   Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Id.*

55.   The EPA Benchmark applicable to Defendant for N+N is 0.68 mg/L. MSGP EPA Benchmark Table 8.J-1.

56.   The EPA Benchmark applicable to Defendant for TSS is 100 mg/L. MSGP EPA Benchmark Tables 8.E-1 & 8.J-1.

57.   The EPA Benchmark applicable to Defendant for total iron is 1.0mg/L. MSGP EPA Benchmark Table 8.C-1.

58.   The EPA Benchmark applicable to Defendant for total zinc in freshwater based on 100mg/L hardness is 0.12 mg/L. MSGP EPA Benchmark Table 8.C-1.

59.   The EPA Benchmark applicable to Defendant for total zinc in saltwater is 0.09 mg/L. *Id.*

60.   The EPA Benchmark applicable to Defendant for total lead in freshwater based on 100mg/L hardness is 0.082 mg/L. *Id.*

61.   The EPA Benchmark applicable to Defendant for total lead in saltwater is

0.21 mg/L. *Id.*

62.    Failure to develop and/or implement BMPs that constitute BAT and BCT is a violation of the General Industrial Permit. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 Permit § V.A.

**D.    The General Industrial Permit Receiving Water Limitations.**

63.    The General Industrial Permit Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater from adversely impacting human health or the environment. 1997 Permit § C.1; 2015 Permit § VI.B.

64.    Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the General Industrial Permit's Receiving Water Limitations. *Id.*

65.    The General Industrial Permit Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. 1997 Permit § C.2; 2015 Permit § VI.A.

66.    Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the Beneficial Uses of the waters that receive polluted discharges.

67.    The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan that contains WQSs for water bodies within its geographical area.

68.    WQSs applicable to dischargers covered by the General Industrial Permit include, but are not limited to, those set out in the Water Quality Control Plan for the San Diego Basin, California Regional Water Quality Control Board, San Diego Region ("Basin Plan"), and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

69.    The CTR includes numeric criteria set to protect human health and the

Complaint                                   11

environment in the State of California. See Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), *available at* http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

70.     The CTR sets forth maximum concentration levels of several toxic pollutants such that California can achieve health and environmental protection goals.

71.     The CTR sets forth the following maximum concentrations for freshwater inland surface waters, based on 100mg/L hardness: lead – .065 mg/L; zinc – .12 mg/L; copper – .014 mg/L. 40 C.F.R. § 131.38.

72.     The CTR sets forth the following maximum concentrations for saltwater bays and estuaries, based on 100mg/L hardness: lead – 0.21 mg/L; zinc – 0.09 mg/L; copper – .0048 mg/L. 40 C.F.R. § 131.38.

73.     The Basin Plan identifies "Beneficial Uses" for water bodies in the San Diego region.

74.     Beneficial Uses for surface waters are designated under the Clean Water Act section 303 in accordance with regulations contained in 40 C.F.R. § 131. The State is required to specify appropriate water Beneficial Uses to be achieved and protected. Basin Plan, at 2-2.

75.     The Beneficial Use designation of surface waters of the state must take into consideration the use and value of water for public water supplies, protection and propagation of fish, shellfish and wildlife, recreation in and on the water, agricultural, industrial and other purposes including navigation. *Id.*

76.     The existing and potential Beneficial Uses for San Vicente Creek at Slaughterhouse Canyon include: Municipal and Domestic Supply, Contact Water Recreation, Wildlife Habitat, Warm Freshwater Habitat, Agricultural Supply, Industrial Service Supply. Basin Plan at Table 2-2.

77.     The Beneficial Uses for the San Diego River downstream of the Slaughterhouse Facility's point of discharge include: Contact Water Recreation, Non-

Complaint                                    12

Contact Water Recreation, Warm Freshwater Habitat, Wildlife Habitat, Preservation of Biological Habitats of Special Significance, Rare, Threatened, or Endangered Species, Agricultural Supply, and Industrial Service Supply. *Id.*

78.     The existing and potential Beneficial Uses for San Clemente Canyon Creek include: Contact Water Recreation, Non-Contact Water Recreation, Warm Freshwater Habitat, Wildlife Habitat, Rare, Threatened, or Endangered Species, and Spawning, Reproduction, and/or Early Development. *Id.*

79.     The existing and potential Beneficial Uses for Rose Creek include: Contact Water Recreation, Non-Contact Water Recreation, Warm Freshwater Habitat, Wildlife Habitat, and Industrial Service Supply. *Id.*

80.     The existing and potential Beneficial Uses for Mission Bay are: Water Contact Recreation, Non-Contact Water Recreation, Wildlife Habitat, Rare, Threatened, or Endangered Species, Migration of Aquatic Organisms, Marine Habitat, Estuarine Habitat, Spawning, Reproduction, and/or Early Development, Shellfish Harvesting, Commercial and Sport Fishing, and Industrial Service Supply. Basin Plan at Table 2-3.

81.     The Beneficial Uses for the San Diego Bay include: Industrial Service Supply, Navigation, Contact Water Recreation, Non-Contact Water Recreation, Commercial and Sport Fishing, Wildlife Habitat, Estuarine Habitat, Preservation of Biological Habitats of Special Significance, Marine Habitat, Migration of Aquatic Organism, Spawning Reproduction, and/or Early Development, Shell Harvesting, and Rare, Threatened, or Endangered Species. *Id.*

82.     The Beneficial Uses for the Pacific Ocean include: Industrial Service Supply, Navigation, Contact Water Recreation, Non-Contact Water Recreation, Commercial and Sport Fishing, Wildlife Habitat, Preservation of Biological Habitats of Special Significance, Marine Habitat, Migration of Aquatic Organism, Spawning Reproduction, and/or Early Development, Shell Harvesting, Aqua Culture, and Rare, Threatened, or Endangered Species. *Id.*

83.     Surface waters that cannot support the Beneficial Uses of those waters listed

Complaint                                    13

in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

84.    According to the 2016 303(d) List of Impaired Water Bodies,[2] Rose Creek is impaired for benthic community effects, selenium, toxicity. Coastkeeper monitoring data reported in the California Environmental Data Exchange Network ("CEDEN") shows that Rose Creek is also impaired for bacteria.

85.    According to the 2016 303(d) List of Impaired Water Bodies, Mission Bay at the mouth of Rose Creek is impaired for lead and for eutrophic conditions (nutrients). Other areas of Mission Bay are impaired for pathogens (including enterococcus, fecal coliform, and total coliform), copper, and toxicity.

86.    According to the 2016 303(d) List of Impaired Water Bodies, the San Diego Bay Shoreline near Seventh Street is impaired for benthic community effects and sediment toxicity. The San Diego Bay and other areas of its shorelines are impaired for polychlorinated biphenyls ("PCBs"), benthic community effects, sediment toxicity, copper, total coliform, enterococcus, fecal coliform, chlordane, polycyclic aromatic hydrocarbons ("PAH"), and mercury.

87.    According to the 2016 303(d) List of Impaired Water Bodies, San Vicente Creek is impaired for ammonia as nitrogen, enterococcus, phosphorus, total nitrogen (as N), and toxicity.

88.    According to the 2016 303(d) List of Impaired Water Bodies, the upper reach of the San Diego River is impaired for enterococcus, low dissolved oxygen, and sulfates.

89.    According to the 2016 303(d) List of Impaired Water Bodies, the lower reach of the San Diego River is impaired for benthic community effects, cadmium, enterococcus, nitrogen, low dissolved oxygen, phosphorus, total dissolved solids, and

---

[2] 2012 Integrated Report – All Assessed Waters, *available at* http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2012.shtml (last accessed on February 22, 2017).

Complaint                                14

toxicity.

90.    According to the 2016 303(d) List of Impaired Water Bodies, the Pacific Ocean shoreline at the San Diego River outlet is impaired for indicator bacteria such as enterococcus and total coliform.

91.    Polluted discharges from industrial facilities, such as the Hanson Facilities, contribute to the degradation of these already impaired surface waters, as well as aquatic-dependent wildlife.

92.    The Basin Plan sets forth WQSs for surface waters and enclosed bay and estuaries for, among other things: floating material, O&G, pH, settleable matter, suspended materials, iron, phosphorus, and toxic substances.

93.    The Basin Plan Objective for Total Iron is 0.3 mg/L for San Vicente Creek, San Clemente Creek, Rose Creek, the San Diego River, and Diego Bay. Basin Plan Table 3-2.

94.    The Basin Plan Objective for total Phosphorus mandates that "[c]oncentrations of nitrogen and phosphorus, by themselves or in combination with other nutrients, shall be maintained at levels below those which stimulate algae and emergent plant growth. Threshold total Phosphorus (P) concentrations shall not exceed 0.05 mg/L in any stream at the point where it enters any standing body of water, nor 0.025 mg/L in any standing body of water." The Basin Plan thus sets a goal of "0.1 mg/L total P" in order to prevent plant nuisances in streams and other flowing waters including San Vicente Creek, San Clemente Creek, Rose Creek, the San Diego River, as well as for Diego Bay. *Id.*

95.    Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

96.    In adopting the CTR, the EPA expressly directed that "[a]ll waters (including lakes, estuaries and marine waters) … are subject to the Criteria promulgated today. Such criteria will need to be attained at the end of the discharge pipe, unless the State authorizes a mixing zone." 65 F.R. § 31682-01, 31701.

Complaint                    15

97.    Similarly, the Basin Plan provides that absent any "allowance for dilution," waste discharges are prohibited unless "the quality of the discharge" meets its Criteria. Basin Plan at 4-19.

98.    Because the General Industrial Permit Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the General Industrial Permit. See 1997 Permit § C.2; 2015 Permit § VI.A; see also *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914, 926 (C.D. Cal. 2009).

99.    "'Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for [an] enforcement action.' [Citation]." *Natural Resources Defense Council, Inc.* ("*NRDC*") *v. County of Los Angeles,* 725 F.3d 1194, 1204 (9th Cir. 2013).

100.    The General Industrial Permit Receiving Water Limitations are violated each time polluted storm water discharges from the Facility. Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS, it is a separate and distinct violation of Receiving Water Limitation C.2 of the 1997 Permit, Receiving Water Limitation VI.A of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

101.    Each time discharges of storm water from the Facility adversely impact human health or the environment, it is a separate and distinct violation of Receiving Water Limitation C.1 of the 1997 Permit, Receiving Water Limitation VI.B of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

**E.    The General Industrial Permit Storm Water Pollution Prevention Plan Requirements**

102.    Section A.1.a and Provision E.2 of the 1997 Permit require dischargers to have developed and implemented a Storm Water Pollution Prevention Plan ("SWPPP") by October 1, 1992, or prior to beginning industrial activities, that meets all the

requirements of the Industrial Permit. Sections X.A-B of the 2015 Permit require development and implementation of site-specific SWPPPs by July 1, 2015 or upon commencement of industrial activity.

103.   The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 1997 Permit § A.2; 2015 Permit § X.

104.   The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. 1997 Permit § A.2; 2015 Permit § X.G.

105.   The SWPPP must identify site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. 1997 Permit § A.2; 2015 Permit § X.H.

106.   The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT, and as necessary to comply with the General Industrial Permit. 1997 Permit § A.2; 2015 Permit §§ I.D.32, X.C.

107.   The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating

activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan, also referred to as a Monitoring and Reporting Plan. 1997 Permit §§ A.1-10; 2015 Permit §§ X.A-I.

108.   The General Industrial Permit requires the discharger to evaluate the SWPPP at least annually and revise it as necessary to ensure compliance with the General Industrial Permit. 1997 Permit §§A.9-10; 2015 Permit §§ X.A.9, X.B.1. The 2015 Permit requires dischargers to "certify and submit via SMARTS their SWPPP within 30 days whenever the SWPPP contains significant revision(s)." 2015 Permit § X.B.2.

109.   The General Industrial Permit requires dischargers to conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit §§ A.9.a-c; 2015 Permit § XV.

110.   Section A.9.d of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the General Industrial Permit. 1997 Permit §§ A.9.d.i-vi. If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the General Industrial Permit. *Id.* § A.9.d. The evaluation report shall be submitted as part of the Annual Report specified in § B.14 of the General Industrial Permit. *Id.*

111.   The SWPPP and site maps must be assessed and revised as necessary to ensure accuracy and effectiveness. 1997 Permit §§ A.1, B.3-4; 2015 Permit §§ I.J.55, X.B.1.

Complaint                                    18

**F.    The General Industrial Permit Monitoring and Reporting Requirements.**

112.    The General Industrial Permit requires permittees to develop and implement a monitoring and reporting program ("M&RP"). 1997 Permit §§ B.1-2, E.3; 2015 Permit, §§ X.I, XI.3.

113.    The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the General Industrial Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit §§ B.2.a-b; 2015 Permit §§ X.I, XI.

114.    The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 1997 Permit §§ B.2.a, B.2.d; 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43.

115.    The M&RP must ensure that storm water discharges are in compliance with the General Industrial Permit Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit § B.2; 2015 Permit §§ I.J.55-56, XI.

116.    The M&RP shall be revised as necessary to ensure compliance with the General Industrial Permit. 1997 Permit § B.2.d; 2015 Permit § XI.A.4.

117.    The General Industrial Permit requires dischargers conduct monthly visual observations of stormwater discharges, stormwater drainage areas, and for the presence of unauthorized non-storm water discharges. 1997 Permit §B.4.a (monthly observations of each discharge location required); 2015 Permit § XI.A.1 (monthly observations of each drainage area required).

118.    Section B.4.c of the 1997 Permit and Section XI.A.2 of the 2015 Permit require dischargers to document the presence of any floating and suspended materials, oil

---

[3] The 2015 Permit refers to the M&RP as a Monitoring Implementation Plan or "MIP."

and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges, and to eliminate unauthorized non-storm water discharges. 1997 Permit § B.4.c; 2015 Permit § XI.A.3.

119.   The General Industrial Permit requires dischargers to revise the M&RP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit § B.4.c; 2015 Permit § X.B.1.

120.   The General Industrial Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. 1997 Permit §§ B.5, B.7; 2015 Permit § XI.B.4.

121.   The 1997 Permit defines Wet Season as October 1-May 30. 1997 Permit, Section B.4.a.

122.   Section B.5.a of the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. *Id.* Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled. *Id.*

123.   Section B.5.b of the 1997 Permit required sampling to occur during scheduled facility operating hours that are preceded by at least three (3) working days without storm water discharge.

124.   Section B.15 of the 1997 Permit required dischargers participating in a group monitoring plan to collect at least two (2) samples from each discharge point at the Facility over a five (5) year period. See 1997 Permit §§ B.5, B.7, B.15.

125.   Section XI.B.1 of the 2015 Permit requires sampling from a qualifying storm

Complaint                                    20

event ("QSE"), which is a precipitation event that produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area.

126.    The 2015 Permit defines Reporting Year as July 1 through June 30. 2015 Permit § I.M.62.b.

127.    Section XI.B.2 of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30).

128.    Section XI.B.3 of the 2015 Permit requires dischargers participating in a compliance group to collect and analyze storm water samples from one (1) QSE within the first half of each Reporting Year (July 1 to December 31) and one (1) QSE within the second half of each Reporting Year (January 1 to June 30).

129.    The Hanson Facilities were, over the past five years, and continue to be, members of the BMI Compliance Group. Thus the Hanson Facilities Owners and/or Operators must comply with the group monitoring provisions set forth in Section B.15 of the 1997 Permit and Section XI.B.3 of the 2015 Permit.

130.    Section XI.B.11 of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via California's Storm Water Multiple Application & Report Tracking System ("SMARTS") database within thirty (30) days of obtaining the results for each sampling event.

131.    Section B.5.c.i of the 1997 Permit required dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and total organic carbon ("TOC"). A discharger may substitute analysis for O&G instead of TOC.

132.    Section B.5.c.ii of the 1997 Permit further required dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility.

133.    Section XI.B.6.a-b of the 2015 Permit requires dischargers to analyze

Complaint                                    21

1   samples for TSS, O&G, and pH.

2       134.   Section XI.B.6.c of the 2015 Permit requires dischargers to analyze samples

3   for other pollutants likely to be present in significant quantities in the storm water

4   discharged from the facility that serve as indicators of the presence of all industrial

5   pollutants on a facility-specific basis.

6       135.   Section XI.B.6 of the 2015 Permit also requires dischargers to analyze storm

7   water samples for additional applicable industrial parameters related to receiving waters

8   with 303(d) listed impairments, or approved Total Maximum Daily Loads.

9       136.   Section B.14 of the 1997 Permit required that dischargers submit an Annual

10  Report to the applicable Regional Board by July 1 of each year. The Annual Report must

11  include (1) a summary of visual observations and sampling results, (2) an evaluation of

12  the visual observations and sampling and analysis results, (3) laboratory reports, (4) the

13  annual comprehensive site compliance evaluation report specified in Section A(9), (5) an

14  explanation of why a facility did not implement any activities required, and (6) the

15  records specified in Section B.13.i. *Id.*

16      137.   Section C.11.d of the 1997 Permit requires facility operators to report any

17  incidence of noncompliance with the Industrial Permit at the time monitoring reports are

18  submitted. Reports of noncompliance must contain (1) a description of noncompliance

19  and its cause, (2) the period of noncompliance, including exact dates and times, and if the

20  noncompliance has not been corrected, the anticipated time it is expected to continue, and

21  (3) steps taken or planned to reduce and prevent recurrence of the noncompliance. 1997

22  Permit § C.11.d.

23      138.   Section XVI of the 2015 requires dischargers to submit an annual report to

24  the applicable Regional Board by July 15 of each year. The Annual report must include a

25  (1) Compliance Checklist that indicates whether a discharger complies with, and has

26  addressed all applicable requirements of the 2015 Permit, (2) an explanation for any non-

27  compliance of requirements within the Reporting Year, as indicated in the Compliance

28  Checklist, (3) an identification, including page numbers and/or Sections, of all revisions

---

Complaint                                    22

made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation. *Id.*

139.   The General Industrial Permit requires that all reports, certifications, or other information required by the Permit or requested by a regional board to have been signed by an authorized representative of the facility's operators. 1997 Permit § C.9; 2015 Permit § XX.K.

140.   The General Industrial Permit requires that signatories under Sections C.9-10 of the 1997 Permit, and Sections XX.K-L of the 2015 Permit, to make the following certification: "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to ensure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

**G.     Conditional Waivers of Waste Discharge Requirements for Low Threat Discharges in the San Diego Region.**

141.   The Region 9 Conditional Waiver, Waiver No. 5 requires dischargers of wastes at composting facilities to "not cause, threaten to cause, or contribute to conditions of pollution, contamination, or nuisance" and to implement BMPs that minimize or eliminate the discharge of pollutants that may adversely impact the quality or beneficial uses of waters. Conditional Waiver No. 5 §§ B.2.a., C.1.a.i, C.1.b.

142.   Conditional Waiver No. 5 also requires Compost facilities to be designed, constructed and maintained to prevent wastes, additives, amendments or compost from inundation by surface flows associated with storm events. Conditional Waiver No. 5 § C.1.b.iv.

143.   The Region 9 Conditional Waiver, Waiver No. 9 requires dischargers of

Complaint                                    23

slurries from sand and gravel mining operations to enroll in and be in compliance with the General Industrial Permit. Conditional Waiver No. 9 § D.1 at 44.

144.   Conditional Waiver No. 9 requires dischargers of slurries to "manage their wastes in a manner that protects beneficial uses, and prevent nuisance by implementing management measures ("MMs") and BMPs. *Id.* § G.3.

145.   Dischargers covered by Conditional Waiver No. 9 must locate storage areas and/or sumps in such a way that "prevent[s] conditions of pollution or nuisance, of any surface water body or municipal water well. *Id.* § B.2.c.

**H.     The 2015 Permit Exceedance Response Actions Requirements.**

146.   The 2015 Permit includes Numeric Action Levels ("NALs") that are based on EPA Benchmarks. Like Benchmarks, the NALs indicate "the overall pollutant control performance at any given facility." 2015 Permit § I.M.61; see also *Id.* § I.M.62 and Table 2.

147.   When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." 2015 Permit § XII.B. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *Id.* § XII.C.

148.   Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred. See *Id.* § XII.C. By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of General Industrial Permit ("Level 1 Evaluation"). *Id.* §§ XII.C.1.a-c.

149.   Although the Level 1 Evaluation may focus on the drainage area(s) where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *Id.* § XII.C.1.c.

150.    Based upon the Level 1 Evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the Level 1 Evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the summary of the Level 1 ERA Evaluation, and a detailed description of the necessary SWPPP revisions, and any additional BMPs for each parameter that exceeded an NAL. *Id.* §§ XII.C.2.a.i-ii.

151.    The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *Id.* § XII.C.2.a.iii.

152.    A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *Id.* § XII.C.2.b.

153.    A discharger's Level 1 status for any given parameter changes to Level 2 status if sampling results indicate a NAL exceedance for that same parameter while the discharger is in Level 1. Level 2 status commences on July 1 following the Reporting Year during which the NAL exceedance(s) occurred. *Id.* § XII.D.

154.    Dischargers with Level 2 status shall certify and submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the Reporting Year during which the NAL exceedance(s) occurred. For each new Level 2 NAL exceedance, the Level 2 Action Plan must identify which of the demonstrations in subsection D.2.a through c the Discharger has selected to perform. A new Level 2 NAL exceedance is any Level 2 NAL exceedance for 1) a new parameter in any drainage area, or 2) the same parameter that is being addressed in an existing Level 2 ERA Action Plan in a different drainage area. *Id.* §

XII.D.1.a.

155.   The Discharger shall certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) if this information has changed since previous certifications. *Id.* § XII.D.1.b.

156.   The Level 2 ERA Action Plan shall at a minimum address the drainage areas with corresponding Level 2 NAL exceedances. *Id.* § XII.D.1.c.

157.   All elements of the Level 2 ERA Action Plan shall be implemented as soon as practicable and completed no later than 1 year after submitting the Level 2 ERA Action Plan. *Id.* § XII.D.1.d.

158.   The Level 2 ERA Action Plan shall include a schedule and a detailed description of the tasks required to complete the discharger's selected demonstration(s) as described in subsections D.2.a through c of the 2015 Permit. *Id.* § XII.D.1.e.

159.   On January 1 of the Reporting Year following the submittal of the Level 2 ERA Action Plan, a discharger with Level 2 status shall certify and submit a Level 2 ERA Technical Report prepared by a QISP that includes one or more of the following demonstrations: (a) Industrial Activity BMPs Demonstration, (b) Non-Industrial Pollutant Source Demonstration, or (c) Natural Background Pollutant Source Demonstration. *Id.* §§ XII.D.2.a-c.

160.   NAL exceedances as defined in the General Industrial Permit are not, in and of themselves, violations of the General Industrial Permit. However, NAL exceedances indicate that a facility is performing poorly and failing to implement BMPs that achieve BAT and BCT.

161.   A "[d]ischarger that does not fully comply with the Level 1 status and/or Level 2 status ERA requirements, when required by the terms of this General Permit, is in violation of this General Permit." *Id.* § I.M.63.

/././

/././

/././

# V.    FACTUAL BACKGROUND

## A.    Facility Information

### 1.  The Slaughterhouse Facility

162.    Plaintiffs are informed, believe, and thereon allege Hanson enrolled as a discharger subject to the 1997 Permit on June 3, 2002 for the Slaughterhouse Facility.

163.    Plaintiffs are informed, believe, and thereon allege Hanson enrolled as a discharger under the 2015 Permit for the Slaughterhouse Facility on June 22, 2015, WDID Number 937I017278.

164.    Plaintiffs are informed, believe, and thereon allege Hanson also obtained coverage under the Conditional Waiver, Waiver No. 9 on November 18, 2015.

165.    Plaintiffs are informed, believe, and thereon allege Hanson Aggregates (operating as A-1 Soils) enrolled under the Conditional Waiver, Waiver No. 5 on August 29, 2015.

166.    Plaintiffs are informed, believe, and thereon allege the Slaughterhouse Facility is approximately 60.3 acres.

167.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Facility is approximately 4.1% impervious, comprising about 2.5 acres of the 60.3 total acres of the site.

168.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Facility is currently an active industrial facility covered under the General Industrial Permit.

169.    Plaintiffs are informed, believe, and thereon allege the Slaughterhouse Facility is bordered on the east by the Brewer Crane and Rigging parking area.  There are no operations bordering the Slaughterhouse Facility to the north, south, or west.

170.    The 2017 Slaughterhouse Facility NOI lists the standard industrial classifications ("SIC") codes as 1442, "Construction Sand and Gravel," and 3273, "Ready-Mixed Concrete."

171.    Plaintiffs are informed, believe, and thereon allege the Slaughterhouse

Facility is and/or was assigned the following primary SIC codes while covered under the General Industrial Permit: 1442 – "Construction Sand and Gravel" under MSGP Sector J, Mineral Mining and Dressing; 3273 – "Ready-Mixed Concrete" under Sector E, Glass, Clay, Cement, Concrete, and Gypsum Product Manufacturing; 2875 – "Fertilizers, Mixing Only" under Sector C, Chemical and Allied Products Manufacturing; 7699 – "Repair Shops and Related Services, not elsewhere classified"; and 1429 – "Crushed and Broken Stone, not elsewhere classified" under MSGP Sector J, Mineral Mining and Dressing. See 2015 MSGP, Appendix N.

172.   Plaintiffs are informed, believe, and thereon allege storm water is or has been discharged from at least five discharge points at the Slaughterhouse Facility into Receiving Waters or tributaries of Receiving Waters.

173.   Information available to Plaintiffs indicates that each of the surface waters into which the Slaughterhouse Facility discharges polluted storm water are tributaries to traditional navigable waters, such as San Vicente Creek, the San Diego River, and the Pacific Ocean.

## 2. The National City Facility

174.   Plaintiffs are informed, believe, and thereon allege Hanson enrolled as a discharger subject to the 1997 Permit on April 25, 2006 for the National City Facility.

175.   Plaintiffs are informed, believe, and thereon allege Hanson enrolled as a discharger under the 2015 Permit for the National City Facility on June 22, 2015, WDID Number 9 37I017278.

176.   Plaintiffs are informed, believe, and thereon allege Hanson also obtained coverage under the Conditional Waiver, Waiver No. 9 on June 17, 2015 for the National City Facility.

177.   Plaintiffs are informed, believe, and thereon allege the National City Facility is approximately 2.7 acres, all of which is impervious, and all of which is industrial area exposed to precipitation.

178.   Plaintiffs are informed, believe, and thereon allege that the National City

1  Facility is currently an active industrial facility covered under the General Industrial
2  Permit.

3      179.   Plaintiffs are informed, believe, and thereon allege the National City Facility
4  is bordered on the north by A Navy Exchange Services facility; on the south by Omega
5  Mechanical Contractors; and on the east by railroad tracks. There are no operations from
6  a vacant property located to the west of the Facility.

7      180.   Plaintiffs are informed, believe, and thereon allege the National City Facility
8  has a primary standard industrial classification ("SIC") code of 3273 – "Ready-Mixed
9  Concrete" under Sector E, Glass, Clay, Cement, Concrete, and Gypsum Product
10  Manufacturing. See 2015 MSGP, Appendix N.

11      181.   Plaintiffs are informed, believe, and thereon allege storm water is or has
12  been discharged from at least four discharge points at the National City Facility into
13  Receiving Waters or tributaries of Receiving Waters.

14      182.   Information available to Plaintiffs indicates that each of the surface waters
15  into which the National City Facility discharges polluted storm water are tributaries to
16  traditional navigable waters, such as San Diego Bay, and ultimately the Pacific Ocean.

17  ### 3. The Miramar Facility

18      183.   Plaintiffs are informed, believe, and thereon allege Hanson enrolled as a
19  discharger subject to the General Industrial Permit on April 22, 1992 for the Miramar
20  Facility.

21      184.   Plaintiffs are informed, believe, and thereon allege Hanson submitted its
22  most recent NOI under the 2015 Permit for the Miramar Facility on February 2, 2017,
23  WDID Number 9 37I006224.

24      185.   Plaintiffs are informed, believe, and thereon allege Hanson also obtained
25  coverage under the Conditional Waiver, Waiver No. 9 on June 5, 2015 for the Miramar
26  Facility.

27      186.   Plaintiffs are informed, believe, and thereon allege that the Miramar Facility
28  was approximately 58.7 acres from 2014 until 2017 when the Facility ceased its

Complaint                                   29

1  composting operations.  During that time approximately 1.5% of the facility was

2  impervious, and 87% of the Facility was designated industrial area and/or industrial

3  material exposed to precipitation.

4      187.   Plaintiffs are informed, believe, and thereon allege that from 2014-2017,

5  while the Miramar Facility engaged in composting and soil preparation, the Facility was

6  assigned the following primary SIC codes while covered under the General Industrial

7  Permit: 1442 – "Construction Sand and Gravel" under MSGP Sector J, Mineral Mining

8  and Dressing; 3273 – "Ready-Mixed Concrete" under Sector E, Glass, Clay, Cement,

9  Concrete, and Gypsum Product Manufacturing; 2875 – "Fertilizers, Mixing Only" under

10  Sector C, Chemical and Allied Products Manufacturing; 7699 – "Repair Shops and

11  Related Services, not elsewhere classified"; and 1429 – "Crushed and Broken Stone, not

12  elsewhere classified" under MSGP Sector J, Mineral Mining and Dressing. See 2015

13  MSGP, Appendix N.

14      188.   Plaintiffs are informed, believe, and thereon allege that from approximately

15  November 17, 2017 until approximately July 19, 2018 the Miramar Facility was

16  approximately 49.1 acres, 19% of which was impervious, and 94% of which was

17  designated industrial area and/or industrial material exposed to precipitation.

18      189.   Plaintiffs are informed, believe, and thereon allege that since approximately

19  July 19, 2018, when the Facility expanded to include former landfill area, the Miramar

20  Facility is 88.4 acres, 11% of which is impervious, and 94% of which is designated

21  industrial area and/or industrial material exposed to precipitation.

22      190.   Plaintiffs are informed, believe, and thereon allege that since approximately

23  November 17, 2017, the Miramar Facility has operated under the primary SIC codes of

24  1442 – "Construction Sand and Gravel" under MSGP Sector J, Mineral Mining and

25  Dressing; 3273 – "Ready-Mixed Concrete" under Sector E, Glass, Clay, Cement,

26  Concrete, and Gypsum Product Manufacturing.

27      191.   Plaintiffs are informed, believe, and thereon allege that the Miramar Facility

28  is currently an active industrial facility covered under the General Industrial Permit.

Complaint                         30

192.   Plaintiffs are informed, believe, and thereon allege the Miramar Facility is bordered on the north by the Marine Corps Air Station at Miramar, and there are no other operations bordering the south, east, or west of the Facility.

193.   Plaintiffs are informed, believe, and thereon allege storm water has been discharged from multiple different discharge points through the past five years at the Miramar Facility into Receiving Waters or tributaries of Receiving Waters. The Miramar Facility currently discharges from five different discharge points.

194.   Information available to Plaintiffs indicates that each of the surface waters into which the Miramar Facility discharges polluted storm water are tributaries to traditional navigable waters, such as Rose Creek and Mission Bay.

195.   Plaintiffs are informed, believe, and thereon allege that activities at each of the Hanson Facilities generate significant debris and particulate matter, which contain pollutants and settle on surfaces within the facilities. During rain events, this pollution is washed off those surfaces and into storm water discharge points, which flow to Receiving Waters.

196.   Plaintiffs are informed, believe, and thereon allege the Hanson Facilities polluted discharges have caused and threaten to cause, and/or contribute to the impairment of water quality in Receiving Waters in violation of the General Industrial Permit.

**B.    Description of Industrial Activities and Associated Pollutants at the Hanson Facilities.**

197.   Plaintiffs are informed and believe, and thereon allege, that the industrial activities and areas of industrial activity at each of the Hanson Facilities are pollutant sources.

198.   Plaintiffs are informed, believe, and thereon allege that the industrial operations at each of the Hanson Facilities occur outdoors, exposed to rainfall.

199.   Plaintiffs are informed, believe, and thereon allege particulates from operations and pollutants used and generated at each of the Hanson Facilities are exposed

Complaint                                    31

1  to rainfall.

2     200.   Plaintiffs are informed and believe, and thereon allege, that industrial

3  activities throughout each of the Hanson Facilities occur outdoors without adequate cover

4  to prevent storm water exposure to pollutant sources.

5     201.   Plaintiffs are informed and believe, and thereon allege, that industrial

6  activities throughout each of the Hanson Facilities occur outdoors without adequate

7  containment or treatment measures to prevent polluted storm water from discharging

8  from the Facilities.

9              **1.  The Slaughterhouse Facility**

10     202.   Plaintiffs are informed and believe, and thereon allege, that the primary

11  operations at the Slaughterhouse Facility include compost and mineral blending

12  operations (A-1 Soils), intermittent portable recycling operations, shipping operations to

13  and from the facility by truck, fueling and maintenance operations, and the operation of a

14  concrete plant.

15     203.   Plaintiffs are informed and believe, and thereon allege, that the primary

16  equipment used at the Slaughterhouse Facility includes trucks for shipping, conveyors,

17  compost windrow turners, a concrete plant, a truck wash and reclaim system, a fueling

18  station, an onsite maintenance shop, and storage bins and silos.

19     204.   Plaintiffs are informed, believe, and thereon allege the Slaughterhouse

20  Facility Owner and/or Operator engages in the following industrial activities: compost

21  and mineral blending; vehicle and equipment maintenance, cleaning, repair, and fueling;

22  concrete batching; concrete mixing; trucking of various materials; conveyance of

23  concrete materials; exterior truck washing; interior concrete mixing truck washing and

24  washing water reclamation; crushing and screening of rubble; concrete loading; silo

25  loading; and dust suppression.

26     205.   Plaintiffs are informed, believe, and thereon allege that the following

27  industrial materials are present, have been present, or are likely to be present on site at the

28  Slaughterhouse Facility: top soil, sand, rock, pumice, other minerals, wood shavings and

Complaint                                    32

bark, compost, fertilizers, manure, used stable bedding, green waste, other organics, other soil amendments (blood meal, bone meal, aqua grow, soil stabilizer, calcined clay, cotton seed meal), diesel fuel, oil, used oil, antifreeze and used antifreeze, grease tubes, solvent, kerosene, batteries, gravel, cement, fly ash, admixtures, colors, acid, unprocessed and processed recycle stockpiles, and steel parts.

206.    Plaintiffs are informed, believe, and thereon allege, that the pollutants associated with operations and industrial activities at the Slaughterhouse Facility include, but are not limited to: TSS, N+N, phosphorus, oil and grease O&G, pH, lead, iron, zinc, copper, manganese, ammonia as nitrogen, total nitrogen, chloride, fecal coliform, total coliform, enterococcus, oxygen reducing compounds, sulfates, and total dissolved solids.

207.    Plaintiffs are informed, believe, and thereon allege that pollutants present in storm water discharged from the Slaughterhouse Facility to the Receiving Waters therefore include but are not limited to: TSS, N+N, phosphorus, O&G, pH, lead, iron, zinc, copper, manganese, ammonia as nitrogen, total nitrogen, chloride, fecal coliform, total coliform, enterococcus, oxygen reducing compounds, sulfates, and total dissolved solids.

## 2.  The National City Facility

208.    Plaintiffs are informed and believe, and thereon allege, that the primary operations at the National City Facility include shipping operations to and from the facility by truck, fueling and maintenance operations, and the operation of a concrete plant.

209.    Plaintiffs are informed and believe, and thereon allege, that the primary equipment used at the National City Facility includes trucks for shipping, conveyors, a concrete plant, a truck wash and reclaim system, a fueling station, some onsite maintenance, and storage bins and silos.

210.    Plaintiffs are informed, believe, and thereon allege the National City Facility Owner and/or Operator engages in the following industrial activities: concrete batching; concrete mixing; trucking of various materials; conveyance of concrete materials;

Complaint                                              33

exterior truck washing; interior concrete mixing truck washing and washing water reclamation; concrete loading; silo loading; dust suppression; cleaning, repair, and fueling; and vehicle and equipment maintenance.

211.    Plaintiffs are informed, believe, and thereon allege that the following industrial materials are present, have been present, or are likely to be present on site at the National City Facility: ready-mix concrete, sand, rock, diesel fuel, oil, used oil, antifreeze, used antifreeze, grease, batteries, gravel, cement, fly ash, admixtures, colors, and acid.

212.    Plaintiffs are informed, believe, and thereon allege, that the pollutants associated with operations and industrial activities at the National City Facility include, but are not limited to: TSS, N+N, phosphorus, O&G, pH, lead, iron, zinc, copper, manganese, ammonia as nitrogen, total nitrogen, chloride, oxygen reducing compounds, sulfates, and total dissolved solids.

213.    Plaintiffs are informed, believe, and thereon allege that pollutants present in storm water discharged from the National City Facility to the Receiving Waters therefore include but are not limited to: TSS, N+N, phosphorus, O&G, pH, lead, iron, zinc, copper, manganese, ammonia as nitrogen, total nitrogen, chloride, oxygen reducing compounds, sulfates, and total dissolved solids.

### 3.  The Miramar Facility

214.    Plaintiffs are informed and believe, and thereon allege that the primary operations at the Miramar Facility include recycling operations, shipping operations to and from the facility by truck, fueling and maintenance operations, and the operation of a concrete plant and a cement treated base ("CTB") plant.  Prior to approximately November 2017, the primary operations at the Miramar Facility also included compost and mineral blending operations for soil preparation (A-1 Soils).

215.    Plaintiffs are informed and believe, and thereon allege that the primary equipment used at the Miramar Facility includes trucks for shipping, conveyors, a concrete plant, crushers and screeners, a CTB plant, a truck wash and reclaim system, a

fueling station, an onsite maintenance shop, and storage bins and silos. Prior to approximately November 2017, the primary equipment used at the Miramar Facility also included compost windrow turners.

216.  Plaintiffs are informed, believe, and thereon allege the Miramar Facility Owner and/or Operator engages in the following industrial activities: vehicle and equipment maintenance, cleaning, repair, and fueling; concrete batching; concrete mixing; trucking of various materials; conveyance of concrete materials; exterior truck washing; interior concrete mixing truck washing and washing water reclamation; crushing and screening of rubble; concrete loading; silo loading; and dust suppression. Prior to approximately November 2017, the Miramar Facility Owner and/or Operator also engaged in compost and mineral blending for soil preparation.

217.  Plaintiffs are informed, believe, and thereon allege that the following industrial materials are present, have been present, or are likely to be present on site at the Miramar Facility: top soil, sand, rock, pumice, other minerals, wood shavings and bark, compost, fertilizers, manure, used stable bedding, green waste, other organics, other soil amendments (blood meal, bone meal, aqua grow, soil stabilizer, calcined clay, cotton seed meal), diesel fuel, oil, used oil, antifreeze, used antifreeze, grease tubes, solvent, kerosene, batteries, gravel, cement, fly ash, admixtures, colors, acid, unprocessed and processed recycle stockpiles, and steel parts.

218.  Plaintiffs are informed, believe, and thereon allege, that the pollutants associated with past and/or present operations and industrial activities at the Miramar Facility include, but are not limited to: TSS, N+N, O&G, phosphorus, pH, lead, iron, zinc, copper, manganese, ammonia as nitrogen, total nitrogen, chloride, fecal coliform, total coliform, enterococcus, oxygen reducing compounds, sulfates, and total dissolved solids.

219.  Plaintiffs are informed, believe, and thereon allege that pollutants present in storm water discharged from the Miramar Facility to the Receiving Waters therefore include but are not limited to: TSS, N+N, phosphorus, O&G, pH, lead, iron, zinc, copper,

Complaint                                        35

manganese, ammonia as nitrogen, total nitrogen, chloride, fecal coliform, total coliform, enterococcus, oxygen reducing compounds, sulfates, and total dissolved solids.

220.    Plaintiffs are informed, believe, and thereon allege that the polluted discharges from each Hanson Facility cause, threaten to cause, and/or contribute to the impairment of water quality in Receiving Waters. Plaintiffs further allege that elevated levels of metals, nutrients, sedimentation, and other pollutants have resulted in the inability of Receiving Waters to support their Beneficial Uses.

C.      **The Hanson Facilities Discharge Contaminated Storm Water in Violation of the General Industrial Permit.**

221.    Plaintiffs are informed, believe, and thereon allege that with every significant rain event, each of the Hanson Facilities discharge polluted storm water via storm drainage systems and into the Receiving Waters.

222.    Plaintiffs are informed, believe, and thereon allege that the Receiving Waters into which the Hanson Facilities discharge polluted storm water are waters of the United States and therefore the General Industrial Permit properly regulates discharges to those waters.

223.    Plaintiffs are informed, believe, and thereon allege that storm water discharges from each of the Hanson Facilities violate the Discharge Prohibitions, Effluent Limitations, and the Receiving Water Limitations of the General Industrial Permit.

1.    **Discharges of Polluted Storm Water from the Slaughterhouse Facility in Violation of the General Industrial Permit Effluent Limitations**

224.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Facility has discharged and continues to discharge storm water containing pollutant concentration levels above EPA Benchmarks without implementing BMPs that achieve BAT/BCT in violation of Sections B.3 of the 1997 Permit, and V.A of the 2015 Permit.

225.    Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Slaughterhouse Facility has exceeded the EPA Benchmark value for

N+N. For example, Defendant's monitoring data from January 7, 2016 for DP-5 indicates exceedance levels of N+N at 1.442 mg/L, which is more than double the EPA Benchmark value for N+N of .68 mg/L. See MSGP Tables 8.J-1, 8.C-1; see also MSGP Fact Sheet at 55-56.

226.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Slaughterhouse Facility has exceeded the EPA Benchmark value for TSS. For example, Defendant's monitoring data from January 7, 2016 for DP-5 indicates exceedance levels of TSS at 1,130 mg/L, which is more than eleven (11) times the EPA Benchmark value for TSS of 100 mg/L. See MSGP Tables 8.J-1, Table 8.E-1; see also MSGP Fact Sheet at 55-56.

227.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Slaughterhouse Facility has exceeded the EPA Benchmark value for iron. For example, Defendant's monitoring data from January 7, 2016 for DP-5 indicates exceedance levels of iron at 43.9 mg/L, which is more than forty-three (43) times the EPA Benchmark value for total iron of 1.0 mg/L. See MSGP Table 8.C-1; see also MSGP Fact Sheet at 55-56.

228.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Slaughterhouse Facility has exceeded the EPA Benchmark value for lead. For example, Defendant's monitoring data from January 7, 2016 for DP-5 indicates exceedance levels of lead at 34.4 mg/L, which is well over four hundred (400) times the EPA Benchmark value for total lead of 0.082 mg/L for freshwater based on 100mg/L hardness. *Id.*

229.   As EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards, Plaintiffs are informed, believe, and thereon allege, from visual observations, sample results, and investigations available to Plaintiffs, that the Slaughterhouse Facility has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the Slaughterhouse Facility. See 1997 Permit § B.3; 2015

1  Permit § V.A.

2      230.    Plaintiffs are informed, believe, and thereon allege Slaughterhouse Facility's

3  repeated exceedances of EPA Benchmarks over the past five years for pollutants,

4  including lead, iron, phosphorus, TSS, N+N, and pH-affecting substances, indicate that

5  the Slaughterhouse Facility has failed and continues to fail to develop and/or implement

6  BMPs that meet BAT/BCT.

7          **2.  Discharges of Polluted Storm Water from the Slaughterhouse**

8              **Facility in Violation of the General Industrial Permit Receiving**

9              **Water Limitations**

10     231.    Plaintiffs are informed, believe, and thereon allege that Slaughterhouse

11  Facility has violated and continues to violate multiple General Industrial Permit

12  Receiving Water Limitations.

13     232.    Plaintiffs are informed, believe, and thereon allege that the storm water

14  discharged from the Slaughterhouse Facility has exceeded the CTR Water Quality

15  Standards applicable to lead in California. For example, Defendant's monitoring data

16  from January 7, 2016 for DP-5 indicates levels of lead as high as 34.4 mg/L, which is

17  over five hundred twenty-nine (529) times the freshwater CTR limit of 0.065 mg/L based

18  on 100mg/L hardness.

19     233.    Plaintiffs are informed, believe, and thereon allege that storm water

20  discharged from the Slaughterhouse Facility has exceeded the Basin Plan water quality

21  objective for iron. For example, Defendant's monitoring data from January 7, 2016 for

22  DP-5 indicates levels of iron as high as 43.9 mg/L, which is over one hundred forty-six

23  (146) times the Basin Plan objective of 0.3 mg/L for iron specifically in San Vicente

24  Creek and the lower reach of the San Diego River. See Basin Plan, Table 3-2.

25     234.    Plaintiffs are informed, believe, and thereon allege that storm water

26  discharged from the Slaughterhouse Facility has exceeded the Basin Plan water quality

27  objective for phosphorus. For example, Defendant's monitoring data from January 7,

28  2016 for DP-5 indicates levels of phosphorus as high as 9.9 mg/L, which is ninety-nine

Complaint                                    38

(99) times the Basin Plan objective of 0.1 mg/L for phosphorus specifically in San Vicente Creek and the lower reach of the San Diego River. See Basin Plan, Table 3-2.

235.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Slaughterhouse Facility has exceeded the Basin Plan water quality objective for TSS. For example, Defendant's monitoring data from January 7, 2016 for DP-5 indicates exceedance levels of TSS at 1,130 mg/L. The Basin Plan mandates that "Waters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Basin Plan, 3-32.

236.   The Receiving Waters downstream from the Slaughterhouse Facility are impaired, and thus unable to support their designated Beneficial Uses.  Both San Vicente Creek and the San Diego River are impaired for Phosphorus, a nutrient, which when present at too high of concentrations can result in algal blooms causing serious environmental problems, mass fish die-offs, and human health issues.

237.   Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Facility's storm water discharges contain elevated concentrations of phosphorus, causing or contributing to the impairment or San Vicente Creek and the San Diego River.

238.   As discussed *supra*, according to the 2016 303(d) List of Impaired Water Bodies, San Vicente Creek and the San Diego River are impaired for toxicity.

239.   The Basin Plan states that all waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life.  Discharges of elevated concentrations of lead can contribute to the toxicity and sediment toxicity of Receiving Waters. See Basin Plan at 3-26.

240.   Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Facility's storm water discharges contain elevated concentrations of lead in excess of the CTR limits, causing or contributing to the toxicity impairment of San Vicente Creek and the San Diego River.

241.   As discussed *supra*, according to the 2016 303(d) List of Impaired Water

Complaint                                              39

Bodies, the San Diego River is impaired for benthic community effects.

242. The Basin Plan explains that "[s]uspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." Basin Plan at 3-31.

243. Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Facility's storm water discharges contain elevated concentrations of TSS in excess of the Basin Plan limits, causing and/or contributing to the benthic community effects impairment of the San Diego River.

244. Because the CTR and Basin Plan are applicable WQSs under the General Industrial Permit, Plaintiffs are informed, believe, and thereon allege that discharges from the Slaughterhouse Facility contain concentrations of pollutants that cause or contribute to violations of multiple applicable WQSs, and thus violate Receiving Water Limitation C.2 of the 1997 Permit and/or Receiving Water Limitation VI.A of the 2015 Permit.

245. Plaintiffs are informed, believe, and thereon allege that discharges of elevated concentrations of pollutants in the storm water from the Slaughterhouse Facility also adversely impacts human health, thus violating the Permit Receiving Water Limitation C.1 of the1997 Permit, and VI.B of the 2015 Permit.

### 3. Discharges of Polluted Storm Water from the National City Facility in Violation of the General Industrial Permit Effluent Limitations

246. Plaintiffs are informed, believe, and thereon allege that the National City Facility has discharged and continues to discharge storm water containing pollutant concentration levels above EPA Benchmarks without implementing BMPs that achieve BAT/BCT in violation of sections B.3 of the 1997 Permit and V.A of the 2015 Permit.

247. Plaintiffs are informed, believe, and thereon allege that storm water discharged from the National City Facility has exceeded the EPA Benchmark value for N+N. For example, Defendant's monitoring data from January 9, 2018 for DP-2 indicates

exceedance levels of N+N at mg/L, which exceeds the EPA Benchmark value for N+N of .68 mg/L. See MSGP Tables 8.J-1, 8.C-1; see also MSGP Fact Sheet at 55-56.

248.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the National City Facility has exceeded the EPA Benchmark value for TSS. For example, Defendant's monitoring data from January 9, 2018 for DP-2 indicates exceedance levels of TSS at 167 mg/L, which exceeds the EPA Benchmark value for TSS of 100 mg/L. See MSGP Tables 8.J-1, Table 8.E-1; see also MSGP Fact Sheet at 55-56.

249.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the National City Facility has exceeded the EPA Benchmark value for iron. For example, Defendant's monitoring data from January 9, 2018 for DP-2 indicates exceedance levels of iron at 8.21 mg/L, which is more than eight (8) times the EPA Benchmark value for total iron of 1.0 mg/L. See MSGP Table 8.C-1; see also MSGP Fact Sheet at 55-56.

250.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the National City Facility has exceeded the EPA Benchmark value for lead. For example, Defendant's monitoring data from May 6, 2016 for DP-2 indicates exceedance levels of lead at 1.84 mg/L, which is over eight (8) times the EPA Benchmark value for total lead of 0.21 mg/L for saltwater. *Id.*

251.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the National City Facility has exceeded the EPA Benchmark value for pH. For example, Defendant's monitoring data from May 6, 2016 for DP-2 indicates a pH level of 10.5, which exceeds the EPA Benchmark maximum value for pH of 9.0 s.u. *Id.*

252.   As EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards, Plaintiffs are informed, believe, and thereon allege, from visual observations, sample results, and investigations available to Plaintiffs, that the National City Facility has failed and

continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the National City Facility. See 1997 Permit § B.3; 2015 Permit § V.A.

253.   Plaintiffs are informed, believe, and thereon allege National City Facility's repeated exceedances of EPA Benchmarks over the past five years for pollutants, including lead, iron, TSS, N+N, and pH-affecting substances, indicate that the National City Facility has failed and continues to fail to develop and/or implement BMPs that meet BAT/BCT.

### 4. Discharges of Polluted Storm Water from the National City Facility in Violation of the General Industrial Permit Receiving Water Limitations

254.   Plaintiffs are informed, believe, and thereon allege that the National City Facility has violated and continues to violate multiple General Industrial Permit Receiving Water Limitations.

255.   Plaintiffs are informed, believe, and thereon allege that the storm water discharged from the National City Facility has exceeded the CTR Water Quality Standards applicable to lead in California. For example, Defendant's monitoring data from May 6, 2016 for DP-2 indicates exceedance levels of lead at 1.84 mg/L, which is over eight (8) times the saltwater CTR limit of 0.21 mg/L.

256.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the National City Facility has exceeded the Basin Plan water quality objective for phosphorus. For example, Defendant's monitoring data from January 7, 2016 for DP-5 indicates levels of phosphorus as high as 0.23 mg/L, more the twice the Basin Plan objective of 0.1 mg/L for phosphorus in bays and estuaries and coastal lagoons. See Basin Plan at 3-9.

257.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the National City Facility has exceeded the Basin Plan water quality objective for pH. For example, Defendant's monitoring data from May 6, 2016 for DP-2

indicates a pH level of 10.5, which exceeds the Basin Plan value for pH of 9.0 s.u. for bays and estuaries. See Basin Plan at 3-26.

258.    Plaintiffs are informed, believe, and thereon allege that storm water discharged from the National City Facility has exceeded the Basin Plan water quality objective for TSS. For example, Defendant's monitoring data from January 9, 2018 for DP-2 indicates exceedance levels of TSS at 167 mg/L. The Basin Plan mandates that "Waters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Basin Plan at 3-32.

259.    The Receiving Waters downstream from the National City Facility are impaired, and thus unable to support their designated Beneficial Uses.  The San Diego Bay near the 7th Street outfall is impaired for sediment toxicity, and the greater San Diego Bay is impaired for toxicity. The Basin Plan states that all waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life.  Discharges of elevated concentrations of lead can contribute to the toxicity and sediment toxicity of Receiving Waters. See Basin Plan at 3-26.

260.    Plaintiffs are informed, believe, and thereon allege that the National City Facility's storm water discharges contain elevated concentrations of lead, causing or contributing to the toxicity impairment of San Diego Bay.

261.    As discussed *supra*, according to the 2016 303(d) List of Impaired Water Bodies, the San Diego Bay near the 7th Street outfall is impaired for benthic community effects.

262.    The Basin Plan explains that "[s]uspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." Basin Plan at 3-31.

263.    Plaintiffs are informed, believe, and thereon allege that the National City

Facility's storm water discharges contain elevated concentrations of TSS in excess of the Basin Plan limits, causing and/or contributing to the benthic community effects impairment of San Diego Bay near the 7th Street outfall.

264.   Because the CTR and Basin Plan are applicable WQSs under the General Industrial Permit, Plaintiffs are informed, believe, and thereon allege that discharges from the National City Facility contain concentrations of pollutants that cause or contribute to violations of multiple applicable WQSs, and thus violate Receiving Water Limitation C.2 of the 1997 Permit and/or Receiving Water Limitation VI.A of the 2015 Permit.

265.   Plaintiffs are informed, believe, and thereon allege that discharges of elevated concentrations of pollutants in the storm water from the National City Facility also adversely impacts human health, thus violating Receiving Water Limitation C.1 of the1997 Permit, and VI.B of the 2015 Permit.

### 5.   Discharges of Polluted Storm Water from the Miramar Facility in Violation of the General Industrial Permit Effluent Limitations

266.   Plaintiffs are informed, believe, and thereon allege that the Miramar Facility has discharged and continues to discharge storm water containing pollutant concentration levels above EPA Benchmarks without implementing BMPs that achieve BAT/BCT in violation of Sections B.3 of the 1997 Permit, and V.A of the 2015 Permit.

267.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Miramar Facility has exceeded the EPA Benchmark value for N+N. For example, Defendant's monitoring data from January 7, 2016 for DP-2 indicates exceedance levels of N+N at 10.54 mg/L, which is more than fifteen (15) times the EPA Benchmark value for N+N of .68 mg/L. See MSGP Tables 8.J-1, 8.C-1; see also MSGP Fact Sheet at 55-56. More recently, Defendant's monitoring data from February 27, 2018 for DP-1 indicates exceedance levels of N+N at 1.0, still in exceedance of the EPA Benchmark value.

268.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Miramar Facility has exceeded the EPA Benchmark value for TSS.

For example, Defendant's monitoring data from January 9, 2018 for DP-2 indicates exceedance levels of TSS at 636 mg/L, which is more than six (6) times the EPA Benchmark value for TSS of 100 mg/L. See MSGP Tables 8.J-1, Table 8.E-1; see also MSGP Fact Sheet at 55-56.

269.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Miramar Facility has exceeded the EPA Benchmark value for iron. For example, Defendant's monitoring data from January 9, 2018 for DP-3 indicates exceedance levels of iron at 25.7 mg/L, which is more than twenty-five (25) times the EPA Benchmark value for total iron of 1.0 mg/L. See MSGP Table 8.C-1; see also MSGP Fact Sheet at 55-56.

270.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Miramar Facility has exceeded the EPA Benchmark value for lead. For example, Defendant's monitoring data from January 7, 2016 for DP-2 indicates exceedance levels of lead at 26 mg/L, which is well over three hundred seventeen (317) times the EPA Benchmark value for total lead of 0.082 mg/L for freshwater based on 100mg/L hardness. *Id.*

271.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Miramar Facility has exceeded the EPA Benchmark value for zinc. For example, Defendant's monitoring data from December 16, 2016 for DP-2 indicates exceedance levels of zinc at 0.243 mg/L, which exceeds the EPA Benchmark value for total zinc of 0.12 mg/L for freshwater based on 100mg/L hardness. *Id.*

272.   As EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards, Plaintiffs are informed, believe, and thereon allege, from visual observations, sample results, and investigations available to Plaintiffs, that the Miramar Facility has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the Miramar Facility. See 1997 Permit, Section B.3; 2015 Permit, Section V.A.

Complaint                                    45

273.    Plaintiffs are informed, believe, and thereon allege Miramar Facility's repeated exceedances of EPA Benchmarks over the past five years for pollutants, including lead, iron, phosphorus, TSS, N+N, and pH-affecting substances, indicate that the Miramar Facility has failed and continues to fail to develop and/or implement BMPs that meet BAT/BCT.

### 6.    Discharges of Polluted Storm Water from the Miramar Facility in Violation of the General Industrial Permit Receiving Water Limitations

274.    Plaintiffs are informed, believe, and thereon allege that The Miramar Facility has violated and continues to violate multiple General Industrial Permit Receiving Water Limitations.

275.    Plaintiffs are informed, believe, and thereon allege that the storm water discharged from the Miramar Facility has exceeded the CTR Water Quality Standards applicable to lead in California. For example, Defendant's monitoring data from January 7, 2016 for DP-2 indicates exceedance levels of lead at 26 mg/L, which is four hundred (400) times the freshwater CTR limit of 0.065 mg/L based on 100mg/L hardness. This monitoring data also exceeds saltwater CTR limit of 0.21 mg/L.

276.    Plaintiffs are informed, believe, and thereon allege that the storm water discharged from the Miramar Facility has exceeded the CTR Water Quality Standards applicable to zinc in California. For example, Defendant's monitoring data from December 16, 2016 for DP-2 indicates exceedance levels of zinc at 0.243 mg/L, which exceeds the freshwater CTR limit of 0.12 mg/L based on 100mg/L hardness.  This monitoring data also exceeds the saltwater CTR limit of 0.09.

277.    Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Miramar Facility has exceeded the Basin Plan water quality objective for iron. For example, Defendant's monitoring data from January 9, 2018 for DP-3 indicates exceedance levels of iron at 25.7 mg/L, which is over eighty-five (85) times the Basin Plan objective of 0.3 mg/L for iron in the Miramar Hydrological area,

Complaint                                    46

1   which includes San Clemente Canyon Creek and Rose Creek. See Basin Plan, Table 3-2.

2   278.   Plaintiffs are informed, believe, and thereon allege that storm water
3   discharged from the Miramar Facility has exceeded the Basin Plan water quality
4   objective for phosphorus. For example, Defendant's monitoring data from February 27,
5   2018 for DP-2 indicates levels of phosphorus as high as 0.49 mg/L, which is almost five
6   (5) times the Basin Plan objective of 0.1 mg/L for phosphorus in the Miramar
7   Hydrological area, which includes San Clemente Canyon Creek and Rose Creek. See
8   Basin Plan, Table 3-2.

9   279.   Plaintiffs are informed, believe, and thereon allege that storm water
10  discharged from the Miramar Facility has exceeded the Basin Plan water quality
11  objective for TSS. For example, Defendant's monitoring data from January 9, 2018 for
12  DP-2 indicates levels of TSS at 636 mg/L. The Basin Plan mandates that "Waters shall
13  not contain suspended and settleable solids in concentrations of solids that cause nuisance
14  or adversely affect beneficial uses." Basin Plan at 3-32.

15  280.   Receiving Waters of Rose Creek and Mission Bay downstream from the
16  Miramar Facility are impaired, and thus unable to support their designated Beneficial
17  Uses.

18  281.   As discussed *supra*, according to the 2016 303(d) List of Impaired Water
19  Bodies, Mission Bay at the mouth of Rose Creek is impaired for lead.

20  282.   Plaintiffs are informed, believe, and thereon allege that the Miramar
21  Facility's storm water discharges contain elevated concentrations of lead in excess of the
22  CTR limits, causing and/or contributing to the lead impairment of Mission Bay at the
23  mouth of Rose Creek.

24  283.   As discussed *supra*, according to the 2016 303(d) List of Impaired Water
25  Bodies, Mission Bay at the mouth of Rose Creek is impaired for eutrophic conditions.

26  284.   Eutrophic conditions, or excessive growth of algae and/or other aquatic
27  plants can degrade water quality, are often caused by discharges of excessive nutrient
28  concentrations, primarily phosphorus and nitrogen, into a water body.  Algal blooms

Complaint                                47

depress the dissolved oxygen content of water and can result in mass fish die-offs, human health issues, and problems with taste, odors, color, and increased turbidity. Basin Plan at 3-8.

285.    The Basin Plan mandates that "[i]nland surface waters, bays and estuaries and coastal lagoon waters shall not contain biostimulatory substances in concentrations that promote aquatic growth to the extent that such growths cause nuisance or adversely affect beneficial uses." *Id.* at 3-9.

286.    Plaintiffs are informed, believe, and thereon allege that the Miramar Facility's storm water discharges contain elevated concentrations of phosphorus in excess of the Basin Plan limit, causing and/or contributing to the eutrophic conditions impairment of Mission Bay at the mouth of Rose Creek.

287.    As discussed *supra*, according to the 2016 303(d) List of Impaired Water Bodies, Rose Creek is impaired for toxicity.

288.    The Basin Plan states that all waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life.  Discharges of elevated concentrations of lead and zinc can contribute to the toxicity and sediment toxicity of Receiving Waters. See Basin Plan at 3-26.

289.    Plaintiffs are informed, believe, and thereon allege that the Miramar Facility's storm water discharges contain elevated concentrations of lead and zinc in excess of the CTR limits, causing or contributing to the toxicity impairment of Rose Creek.

290.    As discussed *supra*, according to the 2016 303(d) List of Impaired Water Bodies, Rose Creek is impaired for benthic community effects.

291.    The Basin Plan explains that "[s]uspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development."

1  Basin Plan at 3-31.

2      292.  Plaintiffs are informed, believe, and thereon allege that the Miramar

3  Facility's storm water discharges contain elevated concentrations of TSS in excess of the

4  Basin Plan limits, causing and/or contributing to the benthic community effects

5  impairment of Rose Creek.

6      293.  Because the CTR and Basin Plan are applicable WQSs under the General

7  Industrial Permit, Plaintiffs are informed, believe, and thereon allege that discharges from

8  the Miramar Facility contain concentrations of pollutants that cause or contribute to

9  violations of multiple applicable WQSs, and thus violate Receiving Water Limitation C.2

10 of the 1997 Permit or Receiving Water Limitation VI.A of the 2015 Permit.

11     294.  Plaintiffs are informed, believe, and thereon allege that discharges of

12 elevated concentrations of pollutants in the storm water from the Miramar Facility also

13 adversely impacts human health, thus violating the Permit Receiving Water Limitation

14 C.1 of the1997 Permit, and VI.B of the 2015 Permit.

15     295.  Each time the Hanson Owners and/or Operators discharge polluted storm

16 water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation

17 V.A of the 2015 Permit is a separate and distinct violation of the Storm Water Permit and

18 Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These discharge violations

19 are ongoing and will continue every time a Hanson Facility discharges polluted storm

20 water without developing and/or implementing BMPs that achieve compliance with the

21 BAT/BCT standards.

22     296.  Plaintiffs are informed, believe, and thereon allege that each Hanson Facility

23 has been in violation of these Effluent Limitations since March 27, 2014, and

24 Coastkeeper will update the dates of violations when additional information and data

25 become available. The Hanson Facilities Owners and/or Operators are subject to civil

26 penalties for all violations of the Clean Water Act occurring since March 27, 2014.

27     297.  Plaintiffs are informed, believe, and thereon allege that the Hanson

28 Facilities' discharge violations are ongoing and will continue every time contaminated

Complaint                              49

1    storm water is discharged in violation of the General Industrial Permit Receiving Water

2    Limitations. Each Hanson Facility has been in violation since March 27, 2014, and

3    Coastkeeper will update the dates of violation when additional information and data

4    becomes available. The Hanson Facilities Owners and/or Operators are subject to civil

5    penalties for all violations of the Clean Water Act occurring since March 27, 2014.

6    **D.    The Hanson Facilities' SWPPPs Fail to Comply with the General**

7    **Industrial Permit Requirements**

8    **1.  The Slaughterhouse Facility Owner and/or Operator Has Violated**

9    **and Continues to Violate Permit SWPPP Requirements**

10    298.    A SWPPP for the Slaughterhouse Facility was uploaded and made publicly

11    available via the SMARTS database on July 1, 2015, and is dated June 2015

12    ("Slaughterhouse SWPPP").

13    299.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse

14    Facility Owner and/or Operator has revised the Slaughterhouse SWPPP on two

15    occasions. On February 16, 2016, the SWPPP was revised solely to include the correct

16    WDID on the cover page. On September 15, 2016, the SWPPP was revised solely to

17    include a new sampling requirement from the Water Board. Both of these revised

18    SWPPPs are publicly available via the SMARTS database.

19    300.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse

20    Facility Owners and/or Operator have not revised the Slaughterhouse SWPPP at any

21    other time for any other reason.

22    301.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse

23    SWPPP, as amended on February 16, 2016 and September 15, 2016, is the current

24    SWPPP for the Facility.

25    302.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse

26    Facility Owner and/or Operator has conducted and continues to conduct operations at the

27    Facility with an inadequately developed and/or implemented SWPPP.

28    303.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse

Complaint                                    50

Facility Owner and/or Operator has failed and continues to fail to accurately identify all areas of industrial activity in the Slaughterhouse SWPPP.

304.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Facility Owner and/or Operator has failed and continues to fail to adequately describe all industrial activities in the Slaughterhouse SWPPP.

305.    Plaintiffs are informed, believe, and thereon allege that because the Slaughterhouse Facility Owner and/or Operator has failed and continues to fail to adequately describe all industrial activities, the Slaughterhouse SWPPP has failed and continues to fail to describe all significant materials and processes that are related to the industrial activities at the Facility.

306.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse SWPPP and site map have failed and continue to fail to describe the locations where all materials are stored, received, shipped, and handled, and/or the typical quantities and frequency of significant materials at the Facility.

307.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse SWPPP has failed and continues to fail to adequately assess pollutants associated with potential pollutant sources at the Facility. In particular, the Slaughterhouse SWPPP fails to adequately assess the Facility's potential contribution of all pollutants for which the receiving waters are impaired.

308.    As described *supra*, San Vicente Creek and the San Diego River are Receiving Waters for the Slaughterhouse Facility, and these Receiving Waters are on the 303(d) list as impaired for numerous constituents, including ammonia as nitrogen, chloride, fecal coliform, enterococcus, low dissolved oxygen, manganese, nitrogen, pH, phosphorus, sulfates, total dissolved solids, and total nitrogen.  However, the Slaughterhouse SWPPP only identifies ammonia as nitrogen and total nitrogen as Receiving Water impairments.

309.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse SWPPP has failed and continues to fail to adequately assess pollutants associated with its

Complaint                                          51

1   composting industrial activity at the facility.

2      310.   Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse

3   Facility imports manure and stable bedding from Del Mar Race Track and local horse

4   stables.  Slaughterhouse SWPPP, §§ F.1.1, F.2.1.

5      311.   Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse

6   SWPPP has failed and continues to fail to acknowledge the Facility's potential

7   contribution of metals, including copper and manganese, which are often associated with

8   compost from manure, litter, and large-scale feed lots.

9      312.   Compostable materials may contain nutrients, metals, salts, pathogens, and

10  oxygen-reducing compounds that can degrade water quality if allowed to migrate into

11  groundwater or surface water. The process of composting can allow contaminants to

12  migrate with leachate or wastewater from these materials. State Water Board Order WQ

13  2015-0121-DWQ, Finding 6.

14     313.   Composting typically results in release of water from the feedstock material

15  as biological decomposition occurs. The released water becomes leachate and if sufficient

16  in volume will drain from the compost pile. Precipitation that falls on, or water that is

17  applied to the compost piles may also result in liquid draining from the compost piles.

18  The liquids may contain nutrients, metals, salts, pathogens, and/or oxygen reducing

19  compounds. *Id.*, Finding 18.

20     314.   Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse

21  SWPPP has failed and continues to fail to acknowledge the Facility's potential

22  contribution of other heavy metals, nutrients, pathogens, and other oxygen reducing

23  compounds associated with the Slaughterhouse Facility's composting activities.

24     315.   As the General Industrial Permit requires Facility Owner and/or Operator to

25  analyze storm water dischargers for all pollutants that are likely to be present in the

26  facility's discharges in significant quantities, Plaintiffs are informed, believe, and thereon

27  allege that the Slaughterhouse SWPPP has failed and continues to fail to require the

28  analysis of storm water discharges from the Facility for all parameters required by the

Complaint                              52

1  Permit. See 2015 Permit, Section B.5.c.

2      316.    Plaintiffs are informed, believe, and thereon allege that, due in part to the

3  Slaughterhouse SWPPP's failure to adequately assess all pollutants and pollutants

4  sources at the Facility, storm water discharged from the Slaughterhouse Facility

5  contained pollutant levels for lead, N+N, TSS, iron, phosphorus, and pH, in exceedance

6  of EPA Benchmarks values, CTR limits, and/or Basin Plan objectives.

7      317.    The National City Facility Owner and/or Operator has violated and

8  continues to violate the Permit SWPPP Requirements.

9      318.    A SWPPP for the National City Facility was uploaded and made publicly

10  available via the SMARTS database on July 1, 2015, and is dated June 2015 ("2015

11  National City SWPPP").

12      319.    Plaintiffs are informed, believe, and thereon allege that the National City

13  Facility Owner and/or Operator has submitted two separate revisions to the 2015 National

14  City SWPPP to the SMARTS database.

15      320.    On March 4, 2016, the National City Facility Owner and/or Operator revised

16  sections C.3; F.3; J.X.H.2; L.X.H.4-5; M.2; and Figure 2 of the National City SWPPP to

17  include the addition of Discharge Point 2 ("2016 National City SWPPP").

18      321.    On or about May 22, 2018, the SWPPP National City Facility Owner and/or

19  Operator again revised the National City SWPPP solely to update the legally responsible

20  person ("LRP") for the National City Facility.

21      322.    Plaintiffs are informed, believe, and thereon allege that the National City

22  Facility Owner and/or Operator has not revised the National City SWPPP at any other

23  time, or for any other reason.

24      323.    Plaintiffs are informed, believe, and thereon allege that the 2016 National

25  City SWPPP, as amended on May 22, 2018 to update the Facility LRP, is the current

26  SWPPP for the Facility.

27      324.    Plaintiffs are informed, believe, and thereon allege that the National City

28  Facility Owner and/or Operator has conducted and continues to conduct operations at the

Complaint                          53

Facility with an inadequately developed and/or implemented SWPPP.

325.    Plaintiffs are informed, believe, and thereon allege that the National City Facility Owner and/or Operator has failed and continues to fail to accurately identify all areas of industrial activity in both the 2015 and 2016 National City SWPPPs.

326.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Facility Owner and/or Operator has failed and continues to fail to adequately describe all industrial activities in both the 2015 and 2016 National City SWPPPs.

327.    Plaintiffs are informed, believe, and thereon allege that because the National City Facility Owner and/or Operator has failed and continues to fail to adequately describe all industrial activities, the 2015 and 2016 National City SWPPPs have failed and continue to fail to describe all of the significant materials and processes related to the industrial activities at the Facility.

328.    Plaintiffs are informed, believe, and thereon allege that the 2015 National City SWPPP and site map failed to identify all discharge points at the Facility. For example, the 2015 site map failed to acknowledge the existence of as Discharge Point 2 ("DP-2").

329.    Plaintiffs are informed, believe, and thereon allege that the 2016 National City SWPPP and site map fail to identify all discharge points at the Facility. For example, although the 2016 site map acknowledges DP-2, information available to Plaintiffs indicates the existence of an additional discharge point through the northeast driveway.

330.    Plaintiffs are informed, believe, and thereon allege that the 2015 and 2016 National City SWPPPs and site maps fail to demarcate any grade breaks, and thus fail to acknowledge the existence of more than one drainage area. Information available to Plaintiffs indicates the existence of a grade break and an additional small drainage area flowing towards and out through the northeast driveway.

331.    Plaintiffs are informed, believe, and thereon allege that the 2015 and 2016 National City site maps have failed and continue to fail to describe the locations all materials are stored, received, shipped, and handled, or the typical quantities and

1  frequency of significant materials at the Facility.

2      332.   Plaintiffs are informed, believe, and thereon allege that the 2015 and 2016

3  National City SWPPPs have failed and continue to fail to adequately assess all pollutants

4  associated with potential pollutant sources at the Facility.

5      333.   Plaintiffs are informed, believe, and thereon allege that the 2015 and 2016

6  National City SWPPPs fail to adequately assess the Facility's potential contribution of all

7  pollutants for which the receiving waters are impaired. For example, the San Diego Bay

8  Shoreline Seventh Street Channel is impaired for benthic community effects and

9  sediment toxicity. As discussed *supra*, high concentrations of TSS are deleterious to

10  benthic organisms, and contribute to benthic community effects impairments. The

11  National City Facility's storm water discharges contain elevated concentrations of TSS in

12  excess of the Basin Plan limits, causing and/or contributing to the benthic community

13  effects impairment. However, the National City SWPPPs erroneously state that the "San

14  Diego Bay Shoreline Seventh Street Channel has no 303(d) impairments from industrial

15  activities, so no additional parameters are added." See 2015 National City SWPPP § F;

16  2016 National City SWPPP § F.

17      334.   As the General Industrial Permit requires Facility Owner and/or Operator to

18  analyze storm water dischargers for all pollutants that are likely to be present in the

19  facility's discharges in significant quantities, Plaintiffs are informed, believe, and thereon

20  allege that the National City SWPPPs have failed and continue to fail to require the

21  analysis of storm water discharges from the Facility for all parameters required by the

22  Permit. See 2015 Permit, Section B.5.c.

23      335.   Plaintiffs are informed, believe, and thereon allege that, due in part to the

24  National City SWPPPs' failure to adequately assess all pollutants and pollutant sources at

25  the Facility, storm water discharged from the National City Facility contained pollutant

26  levels for lead, N+N, TSS, iron, phosphorus, and pH, in exceedance of EPA Benchmarks

27  values, CTR limits, and/or Basin Plan objectives.

28  /././

---

Complaint                                55

## 2. The Miramar Facility Owner and/or Operator Has Violated and Continues to Violate the Permit SWPPP Requirements

336.   A SWPPP and site map for the Miramar Facility was uploaded and made publicly available via the SMARTS database on June 30, 2015, and is dated June 2015 ("2015 Miramar SWPPP").

337.   Plaintiffs are informed, believe, and thereon allege that the Miramar Facility Owner and/or Operator revised the Miramar SWPPP on or about December 29, 2016, purportedly in response to discharging storm water with elevated levels of N+N ("2016 Miramar SWPPP"). The Facility's annual average for its N+N discharges for the 2015-16 reporting period was 8.3 mg/L, which is over twelve (12) times the annual NAL of 0.68 mg for N+N. As a result, the Miramar Facility entered Level 1 ERA status for N+N for the 2016-17 reporting period, and an ERA Level 1 Report for N+N was issued on November 30, 2016.

338.   Plaintiffs are informed, believe, and thereon allege that the 2016 Miramar SWPPP solely consists of twenty-one (21) select pages of revisions and amendments to the 2015 Miramar SWPPP without any providing any explanation, summary of changes, or documentation whatsoever regarding the substance of the revisions, in violation of the General Industrial Permit.

339.   Plaintiffs are informed, believe, and thereon allege that the primary revisions encapsulated in the 2016 Miramar SWPPP inappropriately and inaccurately eliminated multiple references to the Facility's A-1 Soils and composting operations, despite the Facility's discharges of extremely high concentrations of N+N in its storm water discharges. For example, the 2016 Miramar SWPPP eliminated references to A-1 Soils and Facility composting operations as follows: removed SIC codes related to composting activities from Section C; removed "compost" and "fertilizers" from the list of industrial materials from Section E; removed composted materials and A-1 soils area from industrial processes and materials handling and storage sections from Sections F.1-2; removed explanation of how the Facility eliminated non-storm water discharges from the

A-1 Soils area from Section F.7; and removed discussion of of A-1 soils as a potential pollutant source for TSS, N+N, and Phosphorus from Section L, the BMPs Table.

340.   Plaintiffs are informed, believe, and thereon allege that soil production, preparation, composting operations are known to be potential pollutant sources of N+N, Phosphorus, and TSS as acknowledged by Defendant's own 2015 Miramar SWPPP. See 2015 Miramar SWPPP § L at 60.

341.   Plaintiffs are informed, believe, and thereon allege that the 2016 Miramar SWPPP is inaccurate and inconsistent on its face. For example, although the 2016 Miramar SWPPP eliminates multiple references to the Facility's A-1 Soils and composting activities, it still includes numerous references to A-1 and composting operations, indicating that the Miramar Facility was engaged in those industrial activities at that time.  In particular, Section C of the 2016 Miramar SWPPP states that the Facility operations include A-1 Soils preparation and sales; the list of industrial materials in Section E include multiple materials related to A-1 soils and composting; Section F.3 acknowledges that compost and mineral screening and blending to produce soil products is a dust and particulate generating activity; and Section F.8 recognizes the A-1 Soils area as a potential erodible surface.

342.   Plaintiffs are informed, believe, and thereon allege that the Miramar Facility Owner and/or Operator failed to properly revise the Miramar SWPPP to address the high levels of N+N in its storm water discharges. Rather than identifying and implementing BMPs to reduce or eliminate N+N discharges, the Miramar Facility Owner and/or Operator egregiously attempted to eliminate references to an industrial activity which was extremely likely to be a pollutant source causing and contributing to the N+N exceedance in violation of the General Industrial Permit.

343.   Plaintiffs are informed, believe, and thereon allege that the Miramar Facility Owner and/or Operator revised the Facility SWPPP and site map on November 17, 2017 ("2017 Miramar SWPPP") to remove A-1 Soils operations from the Facility.

344.   Plaintiffs are informed, believe, and thereon allege that the Miramar Facility

Owner and/or Operator revised the Facility SWPPP and site map on July 19, 2018 ("2018 Miramar SWPPP") to incorporate former landfill area into the Miramar Facility's operations.

345. Plaintiffs are informed, believe, and thereon allege that the Miramar Facility Owner and/or Operator has not revised the Miramar SWPPP at any other time for any other reason.

346. Plaintiffs are informed, believe, and thereon allege that the 2018 Miramar SWPPP is the current SWPPP for the Facility.

347. Plaintiffs are informed, believe, and thereon allege that the Miramar Facility Owner and/or Operator has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

348. Plaintiffs are informed, believe, and thereon allege that the Miramar Facility Owner and/or Operator has failed and continues to fail to accurately identify all areas of industrial activity in the Miramar SWPPPs.

349. Plaintiffs are informed, believe, and thereon allege that the Miramar Facility Owner and/or Operator has failed and continues to fail to adequately describe all industrial activities in the Miramar SWPPPs.

350. Plaintiffs are informed, believe, and thereon allege that because the Miramar Facility Owner and/or Operator has failed and continues to fail adequately describe all industrial activities, the Miramar SWPPPs have failed and continue to fail to describe all significant materials and processes related to the Facility's industrial activities.

351. Plaintiffs are informed, believe, and thereon allege that the Miramar SWPPPs and site maps have failed and continue to fail to describe the locations where all materials are stored, received, shipped, and handled, or the typical quantities and frequency of significant materials at the Facility.

352. Plaintiffs are informed, believe, and thereon allege that the Miramar SWPPPs have failed and continue to fail to adequately assess pollutants associated with potential pollutant sources at the Facility. In particular, the Miramar SWPPPs have failed

and continue to fail to adequately assess the Facility's potential contribution of all pollutants for which the receiving waters are impaired.

353.    As described *supra*, Rose Creek and Mission Bay are Receiving Waters for the Miramar Facility. Rose Creek is on the 303(d) list as impaired for selenium, toxicity, and benthic community effects. Plaintiffs' own monitoring data, reported in CEDEN, shows Rose Creek is also impaired for bacteria. The mouth of Rose Creek is on the 303(d) list as impaired for lead and for eutrophic conditions (nutrients). Furthermore, the Mission Bay Shoreline at Campland, near the mouth of Rose Creek, is on the 303(d) list as impaired for enterococcus, fecal coliform, and total coliform.

354.    Plaintiffs are informed, believe, and thereon allege that the Miramar Facility Owner and/or Operator has failed and continues to fail properly assess the impairments of Rose Creek, and therefore fails to acknowledge that Receiving Waters downstream from the Miramar Facility are impaired for toxicity and benthic community effects.

355.    Plaintiffs are informed, believe, and thereon allege that the 2016, 2017, and 2018 Miramar SWPPPs fail to acknowledge and/or analyze N+N or phosphorus as pollutants.

356.    Plaintiffs are informed, believe, and thereon allege that the 2016, 2017, and 2018 Miramar SWPPPs fail to identify or implement any BMPs to reduce or eliminate discharges of N+N or phosphorus, despite the Facility's numerous and repeated violations of Effluent Limitations and Receiving Water Limitations specifically for N+N and phosphorus, ensuring that the Facility will continue to discharge polluted storm water that will cause or contribute to Rose Creek's eutrophic conditions impairment.

357.    Plaintiffs are informed, believe, and thereon allege that the 2017 and 2018 Miramar SWPPPs fail to acknowledge and/or analyze zinc or lead as pollutants.

358.    Plaintiffs are informed, believe, and thereon allege that the 2017 and 2018 Miramar SWPPPs fail to identify or implement any BMPs to reduce or eliminate discharges of zinc or lead, despite the Facility's the numerous and repeated violations of Effluent Limitations and Receiving Water Limitations specifically for lead and zinc,

1  ensuring that the Facility will continue to discharge polluted storm water that will cause
2  or contribute to Mission Bay's lead impairment and Rose Creek's toxicity impairment.

3      359.   Plaintiffs are informed, believe, and thereon allege that the 2015 and 2016
4  Miramar SWPPPs failed to adequately assess pollutants associated with the Facility's
5  composting operations and activities.

6      360.   Plaintiffs are informed, believe, and thereon allege that the 2015 and 2016
7  Miramar SWPPPs fail to acknowledge and/or analyze enterococcus, fecal coliform, and
8  total coliform, which are often associated with composting activities, as pollutants.

9      361.   Plaintiffs are informed, believe, and thereon allege that the 2015 and 2016
10  Miramar SWPPPs fail to identify or implement any BMPs to reduce or eliminate
11  discharges of enterococcus, fecal coliform, and total coliform.

12      362.   Plaintiffs are informed, believe, and thereon allege that because Miramar
13  Facility Receiving Waters are impaired for enterococcus, fecal coliform, and total
14  coliform, the 2015 and 2016 Miramar SWPPPs' failure to properly analyze its potential
15  contribution of these pathogens, as well as failures to identify or implement any BMPs to
16  reduce or eliminate discharges of enterococcus, fecal coliform, and total coliform,
17  violated the SWPPP requirements of the 2015 Permit.

18      363.   Plaintiffs are informed, believe, and thereon allege that the Miramar Facility
19  imported manure and stable bedding from local horse stables for use in its past
20  composting operations and activities.

21      364.   Plaintiffs are informed, believe, and thereon allege that the 2015 and 2016
22  Miramar SWPPPs failed to acknowledge the Facility's potential contribution of metals,
23  including copper and manganese, which are often associated with compost from manure,
24  litter, and large-scale feed lots.

25      365.   Compostable materials may contain nutrients, metals, salts, pathogens, and
26  oxygen-reducing compounds that can degrade water quality if allowed to migrate into
27  groundwater or surface water. The process of composting can allow contaminants to
28  migrate with leachate or wastewater from these materials. State Water Board Order WQ

Complaint                                    60

1  2015-0121-DWQ, Finding 6.

2  366.   Composting typically results in release of water from the feedstock material

3  as biological decomposition occurs. The released water becomes leachate and if sufficient

4  in volume will drain from the compost pile. Precipitation that falls on, or water that is

5  applied to the compost piles may also result in liquid draining from the compost piles.

6  The liquids may contain nutrients, metals, salts, pathogens, and/or oxygen reducing

7  compounds. *Id.*, Finding 18.

8  367.   Plaintiffs are informed, believe, and thereon allege that the 2015 and 2016

9  Miramar SWPPPs failed to acknowledge the Facility's potential contribution of other

10  heavy metals, nutrients, pathogens, and other oxygen reducing compounds associated

11  with the Miramar Facility's composting activities.

12  368.   As the General Industrial Permit requires Facility Owners and/or Operators

13  to analyze storm water dischargers for all pollutants that are likely to be present in the

14  facility's discharges in significant quantities, Plaintiffs are informed, believe, and thereon

15  allege that all of the Miramar SWPPPs have failed and/or continue to fail to require the

16  analysis of storm water discharges from the Facility for all parameters required by the

17  Permit. See 2015 Permit, Section B.5.c.

18  369.   Plaintiffs are informed, believe, and thereon allege that, due in part to the

19  Miramar SWPPPs' failure to adequately assess all pollutants and pollutants sources at the

20  Facility, storm water discharged from the Miramar Facility contained pollutant levels for

21  lead, N+N, TSS, iron, phosphorus, zinc, pH, and other potential pollutants in exceedance

22  of EPA Benchmarks values, CTR limits, and/or Basin Plan objectives, and caused or

23  contributed to the multiple Receiving Water impairments.

**3.   Defendant Has Failed and Continues to Fail to Develop, Implement,**
24
**and Revise the Hanson Facilities' SWPPPs to Include BMPs that**
25
**Reduce or Prevent the Discharge of Polluted Storm Water**
26

27  370.   Plaintiffs are informed, believe, and thereon allege that without properly

28  identifying all industrial activities in the Hanson Facilities' SWPPPs, the Hanson Owners

Complaint                                         61

and/or Operators cannot and have not developed and/or implemented all appropriate BMPs at each facility.

371. Plaintiffs are informed, believe, and thereon allege that without properly identifying all significant materials in the Hanson Facilities' SWPPPs, the Hanson Owners and/or Operators cannot and have not developed and/or implemented all appropriate BMPs at each facility.

372. Plaintiffs are informed, believe, and thereon allege that the Hanson Facilities' SWPPPs fail to assess the BMPs at each Facility with respect to each Facility's potential pollutant sources.

373. As discussed *supra*, exceedances of the General Industrial Permit Effluent Limitations, such as EPA benchmarks, and applicable Receiving Water Limitations, such as the CTR and Basin Plan, are indicators that a facility has failed to develop and implement BMPs that meet BAT/BCT.

374. As discussed *supra*, Defendant's own sampling data demonstrates that each of the Hanson Facilities discharged storm water with concentrations of lead, N+N, TSS, iron, phosphorus, and pH, in exceedance of EPA Benchmarks values, CTR limits, and/or Basin Plan objectives. The Miramar Facility also discharged storm water with concentrations of zinc in exceedance of EPA Benchmarks values and CTR limits.

375. Because the each of the Hanson Facilities has discharged numerous pollutants in exceedance of Effluent Limitations and Receiving Water Limitations, Plaintiffs are informed, believe, and thereon allege that the Hanson Owners and/or Operators have failed to develop and/or implement BMPs that:

  i. adequately minimize the exposure of pollutants to storm water at the Facilities;

  ii. adequately control and minimize polluted runoff from the Facilities;

  iii. adequately treat and remove pollutants in storm water prior to the discharge;

  iv. adequately prevent or control contaminated storm water from being

discharged from the Facilities; and

    v.  adequately prevent or control contaminated NSWDs from being discharged from the Facilities.

376. Plaintiffs are informed, believe, and thereon allege that that the Hanson Facilities Owners and/or Operators have failed and continue to fail to develop and/or implement SWPPPs for each Facility that contain BMPs that achieve BAT/BCT in violation of the General Industrial Permit.

377. Plaintiffs are informed, believe, and thereon allege that the Hanson Facilities Owners and/or Operators have also failed to properly operate and maintain the structures and systems put in place at each Facility to achieve compliance with the General Industrial Permit and its SWPPP requirements.

378. Plaintiffs are informed, believe, and thereon allege that each of the Hanson Facilities' SWPPPs fail to analyze the effectiveness of each Facility's existing BMPs.

379. Plaintiffs are informed, believe, and thereon allege that the Hanson Facilities Owners and/or Operators have failed to evaluate and revise the SWPPPs of each Facility to ensure compliance with the General Industrial Permit, as required by Sections A.9-10 of the 1997 Permit, and Sections X.A.9 and X.B.1 of the 2015 Permit.

380. Plaintiffs are informed, believe, and thereon allege that the inadequacy of the BMPs at the Hanson Facilities is in part a result of the Hanson Owners and/or Operators' failure to develop, implement, and revise adequate SWPPPs.

381. Plaintiffs are informed, believe, and thereon allege that the Hanson Facilities Owners and/or Operators' failure to revise each Facility's SWPPPs, and thus failure to improve each Facility's BMPs, despite the numerous and repeated exceedances of Effluent Limitations and Receiving Water Limitations identified in Defendant's own monitoring data, ensures that these exceedances will continue in violation of the General Industrial Permit.

382. Every day the Hanson Facilities Owners and/or Operators operate each Facility with an inadequately developed and/or implemented SWPPP, and/or without

properly revising each SWPPP, is a separate and distinct violation of the General Industrial Permit, New Industrial Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

383.    Plaintiffs are informed, believe, and thereon allege that the Hanson Facilities Owners and/or Operators have been in daily and continuous violation of the General Industrial Permit SWPPP requirements since at least March 27, 2014. These violations are ongoing, and Plaintiffs will include additional violations when information becomes available.

**E.    Defendant Has Failed to Develop, Implement, and/or Revise Adequate Monitoring and Reporting Programs at Each Hanson Facility**

384.    Plaintiffs are informed, believe, and thereon allege that each Hanson Facility SWPPP and revised SWPPP included or includes a Monitoring Implementation Plan, also referred to a Monitoring and Reporting Plan ("M&RP"), in Section M. See Slaughterhouse SWPPP; 2015 National City SWPPP; 2016 National City SWPPP; 2015 Miramar SWPPP; 2016 Miramar SWPPP; 2017 Miramar SWPPP; 2018 Miramar SWPPP.

385.    Plaintiffs are informed, believe, and thereon allege that each Hanson Facility M&RP has failed and/or continues to fail to ensure that BMPs have been adequately developed and/or implemented, or revised if necessary. See 1997 Permit, §§ B.2.a-b; 2015 Permit §§ X.I, XI.

386.    Plaintiffs are informed, believe, and thereon allege that each Hanson Facility M&RP has failed and/or continues to fail to ensure that storm water and non-storm water discharges are in compliance with the General Industrial Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations in violation of the General Industrial Permit. See 1997 Permit § B.2; 2015 Permit §§ I.J.55-56, XI.

387.    Plaintiffs are informed, believe, and thereon allege that the Hanson Owners and/or Operators have failed to revise each M&RP as necessary to ensure compliance with the General Industrial Permit. See 1997 Permit § B.2.d; 2015 Permit § XI.A.4.

388.    Because the Hanson Owners and/or Operators have failed to revise each M&RP as required by the General Industrial Permit, each Hanson M&RP fails to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility in violation of the Permit. See 1997 Permit § B.4.c; 2015 Permit § X.B.1.

## 1. The Slaughterhouse Facility Fails to Comply with the General Industrial Permit's Reporting Requirements

389.    An Annual Report for the Slaughterhouse Facility for the reporting period of July 1, 2013 through June 30, 2014 dated July 10, 2014 is publicly available via the SMARTS database ("2013-14 Slaughterhouse Annual Report").

390.    The 2013-14 Slaughterhouse Annual Report includes only the Slaughterhouse Facility and Operator information.  Every other field of this purported Annual Report is blank and contains none of the information required by the General Industrial Permit.

391.    An Annual Report for the Slaughterhouse Facility for the reporting period of July 1, 2017 through June 30, 2018, signed and dated July 16, 2018, is publicly available via the SMARTS database ("2017-18 Slaughterhouse Annual Report").

392.    There are no Slaughterhouse Facility Annual Reports publicly available via the SMARTS database for the reporting periods of 2014-15, 2015-16, or 2016-17.

393.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Owner and/or Operator failed to prepare and file Annual Reports for the 2014-15, 2015-16, and 2016-17 reporting periods as required by the General Industrial Permit.

394.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Owner and/or Operator failed to prepare and file Annual Reports for the reporting periods of 2013-14 and 2014-15 that included (1) a summary of visual observations and sampling results, (2) an evaluation of the visual observations and sampling and analysis results, (3) laboratory reports, (4) the annual comprehensive site compliance evaluation report specified in Section A(9), (5) an explanation of why a facility did not implement any activities required, and (6) the records specified in Section B.13.i. See 1997 Permit §

Complaint                                    65

B.14.

395.   Plaintiffs are informed, believe, and thereon allege that, despite the numerous incidents of noncompliance alleged herein, the Slaughterhouse Owner and/or Operator failed to report any incidence of noncompliance with the 1997 Permit, including descriptions of any noncompliance and its cause; the period of any noncompliance, including exact dates and times; and for any noncompliance that has not been corrected, the anticipated time it is expected to continue, and steps taken or planned to reduce and prevent recurrence of the noncompliance. See 1997 Permit § C.11.d.

396.   Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Owner and/or Operator failed ensure that the 2013-2014 Slaughterhouse Annual Report was signed by an authorized representative of the facility's operators. See 1997 Permit § C.9.

397.   Because the Slaughterhouse Owner and/or Operator failed to file Annual Reports for the 2015-16 and 2016-17 reporting periods, Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Owner and/or Operator failed to (1) indicate whether they complied with, and addressed all applicable requirements of the 2015 Permit, (2) explain any non-compliance of requirements within the Reporting Years, (3) identify all revisions made to the SWPPP within the Reporting Years, and (4) indicate whether they performed Annual Evaluations during the 2015-16 and 2016-17 reporting periods. See 2015 Permit § XVI.

398.   Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Owner and/or Operator failed to conduct requisite annual evaluations during the 2015-16 and 2016-17 reporting periods. See 2015 Permit §§ XV.A-G.

399.   Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Owner and/or Operator failed to conduct proper visual observations at each discharge location where a sample was taken during the 2015-16, 2016-17, and 2017-18 reporting periods, without adequate explanation.

400.   Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse

Owner and/or Operator failed to collect and analyze any storm water samples from any storm events from March 27, 2014 through June 30, 2015, when the 2015 Permit took effect. See 1997 Permit § B.5.

401.   Plaintiffs are informed, believe, and thereon allege that although the Slaughterhouse Facility is part of the BMI Compliance Group and is thus subject to reduced sampling requirements, the Slaughterhouse Owner and/or Operator failed to collect and analyze the requisite number of storm water samples for each reporting period from June 30, 2015 through the present.

402.   Under the BMI Compliance Group, the Owners and/or Operators are required to collect and analyze storm water samples from at least one QSE from July 1 to December 31 of each reporting period, and one QSE from January 1 to June 30 of each reporting period.  However, the Slaughterhouse Owner and/or Operator only collected one sample during the entire 2015-16 reporting period (on January, 7, 2016); one sample during the entire 2016-17 reporting period (on January 13, 2017); and failed to collect any samples from July 1 to December 31, 2017.  See 2015 Permit § XI.B.

403.   Plaintiffs are informed, believe, and thereon allege that although the Slaughterhouse Facility Owner and/or Operator had numerous opportunities to sample and analyze storm water runoff, they failed to do so.

404.   Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Owner and/or Operator failed to collect and analyze storm water samples from all discharge locations at the Facility for each reporting period since March 27, 2014. For example, despite identifying five discharge points in the Facility SWPPP, on January 7, 2016, the Slaughterhouse Owner and/or Operator collected samples from DP-1, DP-4, and DP-5, but not from DP-2 or DP-3. On January 13, 2017, the Slaughterhouse Owner and/or Operator collected samples from DP-1 and DP-4, but not from DP-2, DP-3, or DP-5. The Slaughterhouse Owner and/or Operator has never collected samples from all discharge points during a single QSE, ensuring that they never sampled, analyzed, or understood the full extent of pollutants in the Facility's discharges.

Complaint                                    67

405.   Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Owner and/or Operator failed to analyze storm water samples collected for all required parameters including pollutants likely to be present in the Facility's storm water discharges for each reporting period since March 27, 2014.  For example, though the Slaughterhouse Facility SWPPP and General Industrial Permit require monitoring of zinc, the Owner and/or Operator has consistently failed to sample for zinc during all sampling events. See Slaughterhouse SWPPP § M.5.C.

406.   Information available to Plaintiffs indicates that the Slaughterhouse Owner and/or Operator failed to submit any reports within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmark values or applicable Water Quality Standards, nor any reports describing the Slaughterhouse Facility's noncompliance with the General Industrial Permit. See 1997 Permit §§ C.4.a, C.11.d.

407.   Information available to Plaintiffs indicates that, despite discharging storm water and/or non-storm water containing pollutants in violation of Receiving Water Limitations, Defendant has not conducted any assessments nor submitted any reports as required by Section XX.B of the 2015 Permit.

408.   Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Owner and/or Operator failed to describe numerous instances of noncompliance with the General Industrial Permit at the Slaughterhouse Facility in the 2017-18 Annual Report.

409.   Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Owner and/or Operator signed and certified that the Facilities were in compliance with the General Industrial Permit in the 2017-18 Slaughterhouse Annual Report.

410.   Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Owner and/or Operator's certification of compliance in the 2017-18 Annual Report is false because the Facility failed to comply with each of the requirements of Section XI of the 2015 Permit.

411.   Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Owner and/or Operator's certification of compliance in the 2017-18 Annual Report was

false because the Owner and/or Operator has failed and continues to fail to revise the Slaughterhouse SWPPP and M&RP to achieve compliance with the General Industrial Permit.

## 2. The National City Owner and/or Operator Fails to Comply with the General Industrial Permit's Reporting Requirements

412.    There are two Annual Reports for the National City Facility for the reporting period of July 1, 2013 through June 30, 2014 publicly available via the SMARTS database ("2013-14 National City Annual Reports"). One is dated July 17, 2014 and lists Pete Zagar as the contact person for the Facility and the Facility Operator. The other is dated August 5, 2014 and lists Jack Pearson as the contact person for the Facility, and Steve Zacks as the contact person as the Facility Operator.

413.    The 2013-14 National City Annual Reports include only the National City Facility and Operator information.  Every other field of this purported Annual Report is blank and contains none of the information required by the General Industrial Permit.

414.    An Annual Report for the National City Facility for the reporting period of July 1, 2016 through June 30, 2017, signed and dated July 14, 2017, is publicly available via the SMARTS database ("2016-17 National City Annual Report").

415.    An Annual Report for the National City Facility for the reporting period of July 1, 2017 through June 30, 2018, signed and dated July 16, 2018, is publicly available via the SMARTS database ("2017-18 National City Annual Report").

416.    There are no National City Facility Annual Reports publicly available via the SMARTS database for the reporting periods of 2014-15 or 2015-16.

417.    Plaintiffs are informed, believe, and thereon allege that the National City Owner and/or Operator failed to prepare and file Annual Reports for the 2014-15 and 2015-16 reporting periods as required by the General Industrial Permit.

418.    Plaintiffs are informed, believe, and thereon allege that the National City Owner and/or Operator failed to prepare and file Annual Reports for the reporting periods of 2013-14 and 2014-15 that included (1) a summary of visual observations and sampling

results, (2) an evaluation of the visual observations and sampling and analysis results, (3) laboratory reports, (4) the annual comprehensive site compliance evaluation report specified in Section A(9), (5) an explanation of why a facility did not implement any activities required, and (6) the records specified in Section B.13.i. See 1997 Permit § B.14.

419.   Plaintiffs are informed, believe, and thereon allege that, despite the numerous incidents of noncompliance alleged herein, the National City Owner and/or Operator failed to report any incidence of noncompliance with the 1997 Permit, including descriptions of any noncompliance and its cause; the period of any noncompliance, including exact dates and times; and for any noncompliance that has not been corrected, the anticipated time it is expected to continue, and steps taken or planned to reduce and prevent recurrence of the noncompliance. See 1997 Permit §C.11.d.

420.   Plaintiffs are informed, believe, and thereon allege that the National City Owner and/or Operator failed ensure that the 2013-2014 National City Annual Report was signed by an authorized representative of the facility's operators. See 1997 Permit § C.9.

421.   Because the National City Owner and/or Operator failed to file an Annual Report for the 2015-16 reporting period, Plaintiffs are informed, believe, and thereon allege that the National City Owner and/or Operator failed to (1) indicate whether they complied with, and addressed all applicable requirements of the 2015 Permit, (2) explain any non-compliance of requirements within the Reporting Year, (3) identify all revisions made to the SWPPP within the Reporting Year, and (4) indicate whether they performed an Annual Evaluation for the 2015-16 reporting period. See 2015 Permit § XVI.

422.   Plaintiffs are informed, believe, and thereon allege that the National City Owner and/or Operator failed to conduct an annual evaluation during the 2015-16 reporting period. See 2015 Permit § XV.A-G.

423.   Plaintiffs are informed, believe, and thereon allege that the National City Owner and/or Operator failed to conduct proper visual observations at each discharge

1  location where a sample was taken during the 2015-16, 2016-17, and 2017-18 reporting

2  periods, without adequate explanation.

3  424.   Plaintiffs are informed, believe, and thereon allege that the National City

4  Owner and/or Operator failed to collect and analyze any storm water samples from any

5  storm events from March 27, 2014 through June 30, 2015, when the 2015 Permit took

6  effect. See 1997 Permit § B.5.

7  425.   Plaintiffs are informed, believe, and thereon allege that although the

8  National City Facility is part of the BMI Compliance Group and is thus subject to

9  reduced sampling requirements, the National City Owner and/or Operator failed to collect

10  and analyze the requisite number of storm water samples for each reporting period from

11  June 30, 2015 through the present.

12  426.   Under the BMI Compliance Group, Owners and/or Operators are required to

13  collect and analyze storm water samples from at least one QSE from July 1 to December

14  31 of each reporting period, and one QSE from January 1 to June 30 of each reporting

15  period.  However, the National City Owner and/or Operator only collected one sample

16  during the entire 2015-16 reporting period (on May 6, 2016); one sample during the

17  entire 2016-17 reporting period (on December 22, 2016); and one sample during the

18  entire 2017-18 reporting period (on January 9, 2018).  See 2015 Permit § XI.B.

19  427.   Plaintiffs are informed, believe, and thereon allege that although the

20  National City Facility Owner and/or Operator had numerous opportunities to sample and

21  analyze storm water runoff, they failed to do so.

22  428.   Plaintiffs are informed, believe, and thereon allege that the National City

23  Owner and/or Operator failed to collect and analyze storm water samples from all

24  discharge locations at the Facility for each reporting period since March 27, 2014. For

25  example, the current National City Facility SWPPP identifies two discharge points: DP-1

26  and DP-2. "DP-1, located at the northwest corner of the facility, receives run-off from the

27  batch plant, storage areas, fueling area, and truck wash area. Discharges from DP-1 will

28  flow to a storm drain west of the property fence." However, the National City Owner

Complaint                                        71

1    and/or Operator has failed to collect a single sample from DP-1 since March 27, 2014,

2    ensuring that they never sampled, analyzed, or understood the full extent of pollutants in

3    the Facility's discharges.

4        429.    Plaintiffs are informed, believe, and thereon allege that the National City

5    Owner and/or Operator failed to analyze storm water samples collected for all required

6    parameters including pollutants likely to be present in the Facility's storm water

7    discharges for each reporting period since March 27, 2014.  For example, though the

8    National City Facility SWPPP and General Industrial Permit require monitoring of field

9    pH, TSS, O&G, iron, lead, zinc, N+N, phosphorus, and mercury, the National City

10   Owner and/or Operator has consistently failed to sample for all these parameters during

11   each sampling events. See National City SWPPPs § M.5.C. On May 6, 2016, Defendant

12   failed to sample for pH, zinc, and mercury. On December 22, 2016, Defendant failed to

13   sample for lead, zinc, N+N, phosphorus, and mercury.

14       430.    Information available to Plaintiffs indicates that the National City Owner

15   and/or Operator has failed to submit any reports within 60-days of becoming aware of

16   levels in its storm water exceeding the EPA Benchmark values or applicable Water

17   Quality Standards, nor have they filed any reports describing the National City Facility's

18   noncompliance with the General Industrial Permit. See 1997 Permit §§ C.4.a, C.11.d.

19       431.    Information available to Plaintiffs indicates that, despite discharging storm

20   water and/or non-storm water containing pollutants in violation of Receiving Water

21   Limitations, the National City Owner and/or Operator has failed to conducted any

22   requisite assessments, nor have they submitted any requisite reports. See 2015 Permit §

23   XX.B.

24       432.    Plaintiffs are informed, believe, and thereon allege that the National City

25   Owner and/or Operator failed to describe numerous instances of noncompliance with the

26   General Industrial Permit at the National City Facility in the 2016-17 and 2017-18

27   Annual Reports.

28       433.    Plaintiffs are informed, believe, and thereon allege that the National City

1  Owner and/or Operator signed and certified that the Facilities were in compliance with
2  the General Industrial Permit in the 2016-17 and 2017-18 National City Annual Reports.

3      434.    Plaintiffs are informed, believe, and thereon allege that the National City
4  Owner and/or Operator's certification of compliance in the 2016-17 and 2017-18 Annual
5  Reports is false because they failed to comply with each of the requirements of Section
6  XI of the 2015 Permit.

7      435.    Plaintiffs are informed, believe, and thereon allege that the National City
8  Owner and/or Operator's certification of compliance in the 2016-17 and 2017-18 Annual
9  Reports was false because the Owner and/or Operator has failed and continues to fail to
10 revise the National City SWPPP and M&RP to achieve compliance with the General
11 Industrial Permit.

### 3. The Miramar Owner and/or Operator Fails to Comply with the General Industrial Permit's Reporting Requirements

14     436.    An Annual Report for the Miramar Facility for the reporting period of July
15 1, 2013 through June 30, 2014, dated July 10, 2014, is publicly available via the
16 SMARTS database ("2013-14 Miramar Annual Report").

17     437.    The 2013-14 Miramar Annual Report includes only the Miramar Facility
18 and Operator information.  Every other field of this purported Annual Report is blank and
19 contains none of the information required by the General Industrial Permit.

20     438.    An Annual Report for the Miramar Facility for the reporting period of July
21 1, 2017 through June 30, 2018, signed and dated July 16, 2018, is publicly available via
22 the SMARTS database ("2017-18 Miramar Annual Report").

23     439.    There are no Miramar Facility Annual Reports publicly available via the
24 SMARTS database for the reporting periods of 2014-15, 2015-16, or 2016-17.

25     440.    Plaintiffs are informed, believe, and thereon allege that the Miramar Owner
26 and/or Operator failed to prepare and file Annual Reports for the 2014-15, 2015-16,
27 2016-17 reporting periods as required by the General Industrial Permit.

28     441.    Plaintiffs are informed, believe, and thereon allege that the Miramar Owner

Complaint                          73

and/or Operator failed to prepare and file Annual Reports for the reporting periods of 2013-14 and 2014-15 that included (1) a summary of visual observations and sampling results, (2) an evaluation of the visual observations and sampling and analysis results, (3) laboratory reports, (4) the annual comprehensive site compliance evaluation report specified in Section A(9), (5) an explanation of why a facility did not implement any activities required, and (6) the records specified in Section B.13.i. See 1997 Permit § B.14.

442.   Plaintiffs are informed, believe, and thereon allege that, despite the numerous incidents of noncompliance alleged herein, the Miramar Owner and/or Operator failed to report any incidence of noncompliance with the 1997 Permit, including descriptions of any noncompliance and its cause; the period of any noncompliance, including exact dates and times; and for any noncompliance that has not been corrected, the anticipated time it is expected to continue, and steps taken or planned to reduce and prevent recurrence of the noncompliance. See 1997 Permit § C.11.d.

443.   Plaintiffs are informed, believe, and thereon allege that the Miramar Owner and/or Operator failed ensure that the 2013-2014 Miramar Annual Report was signed by an authorized representative of the facility's operators. See 1997 Permit § C.9.

444.   Because the Miramar Owner and/or Operator failed to file Annual Reports for the 2015-16 and 2016-17 reporting periods, Plaintiffs are informed, believe, and thereon allege that the Miramar Owner and/or Operator failed to (1) indicate whether they complied with, and addressed all applicable requirements of the 2015 Permit, (2) explain any non-compliance of requirements within the Reporting Years, (3) identify all revisions made to the SWPPP within the Reporting Years, and (4) indicate whether they performed Annual Evaluations for the 2015-16 and 2016-17 reporting periods. See 2015 Permit § XVI.

445.   Plaintiffs are informed, believe, and thereon allege that the Miramar Owner and/or Operator failed to conduct an annual evaluation during the 2015-16 and 2016-17 reporting periods. See 2015 Permit §§ XV.A-G.

446.    Plaintiffs are informed, believe, and thereon allege that the Miramar Owner and/or Operator failed to conduct proper visual observations at each discharge location where a sample was taken during the 2015-16, 2016-17, and 2017-18 reporting periods, without adequate explanation.

447.    Plaintiffs are informed, believe, and thereon allege that the Miramar Owner and/or Operator failed to collect and analyze any storm water samples from any storm events from March 27, 2014 through June 30, 2015, when the 2015 Permit took effect. See 1997 Permit § B.5.

448.    Plaintiffs are informed, believe, and thereon allege that although the Miramar Facility is part of the BMI Compliance Group and is thus subject to reduced sampling requirements, the Miramar Owner and/or Operator failed to collect and analyze the requisite number of storm water samples for each reporting period from June 30, 2015 through the present.

449.    Under the BMI Compliance Group, Owners and/or Operators are required to collect and analyze storm water samples from at least one QSE from July 1 to December 31 of each reporting period, and one QSE from January 1 to June 30 of each reporting period.  However, the Miramar Owner and/or Operator failed to collect any samples between July 1, 2015 and December 31, 2015, and failed to collect any samples between July 1, 2017 and December 31, 2017.  See 2015 Permit § XI.B.

450.    Plaintiffs are informed, believe, and thereon allege that although the Miramar Facility Owner and/or Operator had numerous opportunities to sample and analyze storm water runoff, they failed to do so.

451.    Plaintiffs are informed, believe, and thereon allege that the Miramar Owner and/or Operator failed to collect and analyze storm water samples from all discharge locations at the Facility for each reporting period since March 27, 2014, ensuring that they never sampled, analyzed, or understood the full extent of pollutants in the Facility's discharges.

452.    The 2015 Miramar Facility SWPPP identified three discharge points: DP-1,

DP-2, and DP-3. However, on January 7, 2016 Defendant collected samples from only DP-2. On May 4, 2016, Defendant collected samples from only DP-3.

453.    The 2016 Miramar Facility SWPPP identified four discharge points: DP-1, DP-2, DP-3, and DP-4. However, on December 16, 2016 Defendant collected samples from only DP-1 and DP-2. On January 27, 2017, Defendant collected samples from only DP-3.

454.    The 2017 Miramar Facility SWPPP identified three discharge points: DP-1, DP-2, and DP-3. However, on December 16, 2016 Defendant collected samples from only DP-1 and DP-2. On February 27, 2018, Defendant collected samples from only DP-1 and DP-2.

455.    The 2018 Miramar Facility SWPPP identified five discharge points: DP-1, DP-2, DP-3, DP-4, and DP-5. On November 29, 2018, Defendant collected samples from only DP-1. However, on December 6, 2018 Defendant collected samples from only DP-1, DP-2, and DP-3.

456.    Plaintiffs are informed, believe, and thereon allege that the Miramar Owner and/or Operator failed to analyze storm water samples collected for all required parameters including pollutants likely to be present in the Facility's storm water discharges for each reporting period since March 27, 2014.

457.    Information available to Plaintiffs indicates that the Miramar Owner and/or Operator has not submitted any reports within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmark values or applicable Water Quality Standards, or filed any reports describing the Miramar Facility's noncompliance with the General Industrial Permit. See 1997 Permit §§ C.4.a, C.11.d.

458.    Information available to Plaintiffs indicates that, despite discharging storm water and/or non-storm water containing pollutants in violation of Receiving Water Limitations, the Miramar Owner and/or Operator has not conducted any requisite assessments nor submitted any requisite reports. See 2015 Permit § XX.B.

459.    Plaintiffs are informed, believe, and thereon allege that the Miramar Owner

and/or Operator failed to describe numerous instances of noncompliance with the General Industrial Permit at the Miramar Facility in the 2017-18 Annual Report.

460.   Plaintiffs are informed, believe, and thereon allege that the Miramar Owner and/or Operator signed and certified that the Facility was in compliance with the General Industrial Permit in the 2017-18 Miramar Annual Report.

461.   Plaintiffs are informed, believe, and thereon allege that the Miramar Owner and/or Operator's certification of compliance in the 2017-18 Annual Report is false because they failed to comply with each of the requirements of Section XI of the 2015 Permit.

462.   Plaintiffs are informed, believe, and thereon allege that the Miramar Owner and/or Operator's certification of compliance in the 2017-18 Annual Report was false because the Owner and/or Operator has failed and continues to fail to revise the Miramar SWPPP and M&RP to achieve compliance with the General Industrial Permit.

463.   Plaintiffs are informed, believe, and thereon allege that the Hanson Owners and/or Operators failed to conduct monthly visual observations of stormwater discharges, stormwater drainage areas, and for the presence of unauthorized non-storm water discharges at each Hanson Facility from March 27, 2014 to the present. See 1997 Permit § B.4.a (monthly observations of each discharge location required); 2015 Permit § XI.A.1 (monthly observations of each drainage area required).

464.   Plaintiffs are informed, believe, and thereon allege that the Hanson Owners and/or Operators failed to adequately document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from each Facility from March 27, 2014 to the present. See 1997 Permit § B.4.c; 2015 Permit § XI.A.3.

465.   Plaintiffs are informed, believe, and thereon allege that the Hanson Owners and/or Operators failed to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges, and to eliminate unauthorized non-storm water discharges from

each Facility from March 27, 2014 to the present. *Id.*

466.   Plaintiffs are informed, believe, and thereon allege that the Hanson Owners and/or Operators failed to conduct annual evaluations of all visual sampling, visual inspections, and visual observation records for each Facility throughout each reporting period since March 27, 2014. See 1997 Permit § A.9.a; 2015 Permit § XV.A.

467.   Plaintiffs are informed, believe, and thereon allege that the Hanson Owners and/or Operators failed to conduct annual inspections of all areas of industrial activity and associated potential pollutant sources for potential pollutants that might enter a storm water conveyance system for each Facility throughout each reporting period since March 27, 2014. See 1997 Permit § A.9.b; 2015 Permit § XV.B.

468.   Plaintiffs are informed, believe, and thereon allege that the Hanson Owners and/or Operators failed to conduct annual inspections of all drainage areas previously identified as having no exposure to industrial activities and materials for each Facility throughout each reporting period since March 27, 2014. See 2015 Permit § XV.C.

469.   Plaintiffs are informed, believe, and thereon allege that the Hanson Owners and/or Operators failed to conduct annual inspections of all BMPs, equipment needed to implement BMPs, and an assessment of the effectiveness of all BMPs for each Facility throughout each reporting period since March 27, 2014. See 1997 Permit § A.9.c; 2015 Permit §§ XV.D-F.

470.   Plaintiffs are informed, believe, and thereon allege that the Hanson Owners and/or Operators failed to indicate the presence of all potential pollutants at each Facility for each reporting period since March 27, 2014.

471.   Each day that Defendant has operated and continues to operate the Slaughterhouse Facility without meeting each reporting requirement of the General Industrial Permit constitutes a separate violation of the Permit and the CWA.

/././

/././

/././

Complaint                                   78

**F.    Defendant Has Failed to Comply with All Requirements Under the Permit's Conditional Waivers**

**1.    The Slaughterhouse Facility Has Violated and Continues to Violate the Terms of Conditional Waiver No. 5**

472.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Facility Owner and/or Operators (operating as A-1 Soils) enrolled under the Region 9 Conditional Waiver, Waiver No. 5 on August 29, 2015 as this Facility engaged in composting industrial activities.

473.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Facility's wastes, additives, amendments and other industrial materials from the Facility's composting actives are clearly present in the Facility's storm water discharges and adversely impact the quality and beneficial uses of Receiving Waters.

474.    As discussed *supra*, sampling from DP-5, which received runoff from the A-1 Soils operations area of the Facility, reflects significantly elevated levels of nitrates, phosphorus, TSS, iron and lead. See SWPPP § C.3 ("DP-5, located in the southeast corner of the A-1 soils area, receives run-off from activities and materials in the A-1 soils area except the southern part of the A-1 soils stockpile area.").

475.    As reflected in the Facility's 2015-16 ERA Level 1 Report, Discharge Point 5 received A-1 soils storm water that discharged from the sediment basin. 2015-16 ERA Level 1 Report at 9. As a result of the inadequate sizing of the sediment basin, coupled with Defendant's failure to maintain the sediment basin, the Facility was not designed, constructed, and maintained to prevent wastes, additives, amendments or compost from inundation by surface flows associated with storm events, in violation of Section C.1.b.iv of Conditional Waiver No. 5.

476.    As discussed *supra*, the Slaughterhouse Facility Receiving Waters are impaired for numerous constituents, including nitrogen, total nitrogen as N, ammonia as nitrogen, phosphorus, enterococcus, total coliform, low dissolved oxygen, sulfates, benthic community effects, cadmium, total dissolved solids, and toxicity.

477.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Facility Owner and/or Operators cause and/or contribute to these impairments constituting a violation of Waiver No. 5.

## 2. The National City Facility has Violated and Continues to Violate the Terms of Conditional Waiver No. 9

478.    Plaintiffs are informed, believe, and thereon allege that the National City Facility Owner and/or Operators enrolled under the Conditional Waiver, Waiver No. 9 on June 17, 2015.

479.    Plaintiffs are informed, believe, and thereon allege that the National City Facility Owner and/or Operator uses a "reclaimer process[] to return concrete and interior truck wash water . . . .  Most paste produced by the reclaimer is processed by an Alar system to remove water. Reclaimer and Alar water is pumped to a water tank, and then reused for additional interior truck washing or to make concrete." 2016 National City SWPPP § F.4.

480.    Plaintiffs are informed, believe, and thereon allege that the National City Facility Owner and/or Operator uses some of the contaminated previously-stored water derived from slurries for interior and exterior truck washing activities that take place at multiple locations throughout the Facility. 2016 National City SWPPP § J; 2016 National City Site Map.

481.    The 2016 National City SWPPP acknowledges in Table L that interior and exterior truck washing and handling of return concrete is a potential pollution source of TSS, oil and grease, pH, and iron.

482.    As reflected in the 2016 National City SWPPP, the Facility's drainage areas receive water that has previously passed through storage areas, ponds, and sumps. As a result of the inadequate design of these storage areas, ponds, and sumps, discharged water contributes to conditions of pollution or nuisance in Receiving Waters in violation of Conditional Waiver No. 9 § B.2.c.

483.    Plaintiffs are informed, believe, and thereon allege that the alar and paste

Complaint                                    80

1  storage areas are exposed to rain and discharge contaminated storm water runoff that
2  contributes to conditions of pollution or nuisance, in violation of the Conditional Waiver,
3  Waiver No. 9. See National City Site Map.

4  484.  Defendant's own sampling from Discharge Point 2 reflects significantly
5  elevated levels of iron, lead, phosphorus, oil and grease, TSS, N + N, and high pH, which
6  adversely impacts the quality and beneficial uses of Receiving Waters.

7  485.  As discussed *supra*, the National City Facility Receiving Waters are
8  impaired for numerous constituents, including benthic community effects, sediment
9  toxicity, mercury, polycyclic aromatic hydrocarbons, and PCBs.

10  486.  Plaintiffs are informed, believe, and thereon allege that the National City
11  Facility Owner and/or Operators cause and/or contribute to these impairments
12  constituting a violation of Waiver No. 9.

13  **3.  The Miramar Facility has Violated and Continues to Violate the**
14  **Terms of Conditional Waiver No. 9**

15  487.  Plaintiffs are informed, believe, and thereon allege that the Miramar Facility
16  Owner and/or Operators enrolled under the Conditional Waiver, Waiver No. 9 on June
17  17, 2015.

18  488.  Plaintiffs are informed, believe, and thereon allege that the Miramar Facility
19  Owner and/or Operator uses a "reclaimer process[] to return concrete and interior truck
20  wash water . . . .  Most paste produced by the reclaimer is processed by an Alar system to
21  remove water. Reclaimer and Alar water is pumped to a water tank, and then reused for
22  additional interior truck washing or to make concrete." 2017 and 2018 Miramar SWPPPs
23  § F.1.7.

24  489.  Plaintiffs are informed, believe, and thereon allege that the Miramar Facility
25  Owner and/or Operator uses some of the contaminated previously-stored water derived
26  from slurries for interior and exterior truck washing near the truck wash pond, which
27  drains to Discharge Point 1. 2017 and 2018 Miramar SWPPPs § J; 2018 Miramar site
28  map.

Complaint                                    81

490.   All of the Miramar SWPPPs acknowledge in Table L (BMP Summaries Table) that interior and exterior truck washing and handling of return concrete is a potential pollution source of TSS, pH, and iron.

491.   Plaintiffs are informed, believe, and thereon allege that the alar and paste storage areas are exposed to rain and discharge contaminated storm water runoff that contributes to conditions of pollution or nuisance, in violation of the Conditional Waiver, Waiver No. 9. See Miramar Site Map.

492.   As reflected in the Miramar SWPPP, the Facility's drainage areas receive water that has previously passed through storage areas, ponds, and sumps. As a result of the inadequate design of these storage areas, ponds, and sumps, discharged water contributes to conditions of pollution or nuisance in Receiving Waters in violation of Section B.2.c. of the Conditional Waiver No. 9.

493.   Past sampling from Discharge Point 1 reflects significantly elevated levels of iron, phosphorus, N + N. Furthermore, the Miramar Facility storm water discharges contain elevated levels of pollutants like TSS, lead, iron, zinc, phosphorus, nitrite + nitrate, and pH, adversely impacting the quality and beneficial uses of Receiving Waters.

494.   As discussed *supra*, the Miramar Facility Receiving Waters are impaired for numerous constituents, including eutrophic conditions (nutrients), toxicity, lead, selenium, benthic community effects, bacteria, mercury, and PCBs.

495.   Plaintiffs are informed, believe, and thereon allege that the Miramar Facility Owner and/or Operators contribute to these impairments constituting a violation of Waiver No. 9.

**G.   The Hanson Facilities Owners and/or Operators Fail to Comply with Level 1 and Level 2 ERA Requirements**

**1.   The Slaughterhouse Facility's Violations of ERA Requirements**

496.   A Consolidated ERA Level 1 Report for BMI Compliance Group Facilities, which includes the Slaughterhouse Facility, for the reporting period July 1, 2015 through June 30, 2016, is publicly available via the SMARTS database and dated November 30,

Complaint                                                    82

1  2016 ("2015-16 ERA Level 1 Report").

2      497.   The 2015-16 ERA Level 1 Report explains that the Slaughterhouse Facility

3  discharged storm water containing concentrations of TSS, iron, and phosphorus in excess

4  of NALs during this reporting period. Plaintiffs are informed, believe, and thereon allege

5  that the Slaughterhouse Facility moved to Level 1 status for TSS, iron, and phosphorus

6  for 2016-17 reporting period.

7      498.   The 2015-16 ERA Level 1 recommended increased housekeeping and

8  sediment basin maintenance to prevent any further NALs exceedances at the

9  Slaughterhouse Facility. It did not suggest or require filtration or any advanced BMPs.

10     499.   An ERA Level 2 Action Plan for iron for the Slaughterhouse Facility for the

11  reporting period of July 1, 2016 through June 30, 2017 is publicly available via the

12  SMARTS database and dated December 14, 2017 ("2016-17 ERA Level 2 Action Plan").

13     500.   The 2016-17 ERA Level 2 Action Plan explains that Slaughterhouse Facility

14  again discharged storm water containing concentrations of iron in excess of NALs during

15  this reporting period. Plaintiffs are informed, believe, and thereon allege that the

16  Slaughterhouse Facility moved to Level 2 status for iron for the 2017-18 reporting period,

17  while the Facility remained at Level 1 status for TSS and phosphorus.

18     501.   A Consolidated ERA Level 1 Report for BMI Compliance Group Facilities,

19  which includes the Slaughterhouse Facility, for the reporting period of July 1, 2017

20  through June 30, 2018, is publicly available via the SMARTS database and dated

21  December 27, 2018 ("2017-18 ERA Level 1 Report").

22     502.   The 2017-18 ERA Level 1 Report explains that the Slaughterhouse Facility

23  discharged storm water containing concentrations of pH, TSS, and iron in excess of

24  NALs during this reporting period.

25     503.   An ERA Level 2 Action Plan for TSS and iron for the Slaughterhouse

26  Facility for the reporting period July 1, 2017 through June 30, 2018 is publicly available

27  via the SMARTS database and dated December 27, 2018 ("2017-18 ERA Level 2 Action

28  Plan").

Complaint                              83

504.    An ERA Level 2 Technical Report for TSS and iron for the Slaughterhouse Facility for the reporting period July 1, 2017 through June 30, 2018 is publicly available via the SMARTS database and dated December 27, 2018 ("2017-18 ERA Level 2 Technical Report").

505.    Plaintiffs are informed, believe, and thereon allege that the Slaughterhouse Facility remained at Level 2 for iron, moved to Level 2 for TSS, entered Level 1 for pH, and reverted back to baseline status for phosphorus for the 2018-19 reporting period.

506.    Plaintiffs are informed, believe, and thereon allege that the 2015-16 and 2017-18 ERA Level 1 Reports failed to conduct adequate evaluations to identify the BMPs in the Slaughterhouse Facility's SWPPP that corresponded to each of the NAL exceedances at the Facility.

507.    Plaintiffs are informed, believe, and thereon allege that the 2015-16 and 2017-18 ERA Level 1 Reports failed to conduct adequate evaluations of all drainage areas at the Facility.

508.    Plaintiffs are informed, believe, and thereon allege that the 2015-16 and 2017-18 ERA Level 1 Reports failed to identify all industrial activities that were or may have been contributing to the NAL exceedances.

509.    Plaintiffs are informed, believe, and thereon allege that the 2015-16 and 2017-18 ERA Level 1 Reports failed to adequately analyze pollutant sources that were or may have been related to the NAL exceedances.

510.    Plaintiffs are informed, believe, and thereon allege that the 2015-16 and 2017-18 ERA Level 1 Reports failed to identify necessary additional BMPs to prevent future NAL exceedances and comply with the General Industrial Permit at the Facility.

511.    Plaintiffs are informed, believe, and thereon allege that the 2015-16 and 2017-18 ERA Level 1 Reports failed to include adequate summaries of the Level 1 ERA Evaluation for each of the Facilities.

512.    Because the Slaughterhouse Facility continues to discharge pollutants in its storm water runoff in exceedance of effluent limitations and NAL standards, Plaintiffs

are informed, believe, and thereon allege that the 2016-17 ERA Level 2 Action Plan, 2017-18 ERA Level 2 Action Plan, and 2017-18 ERA Level 2 Technical Report fail to evaluate and identify BMPs that would reduce or prevent NAL exceedances.

### 2. The National City Facility's Violations of ERA Requirements

513. A Consolidated ERA Level 1 Report for BMI Compliance Group Facilities, which includes the National City Facility, for the reporting period of July 1, 2015 through June 30, 2016, is publicly available via the SMARTS database and dated November 30, 2016 ("2015-16 ERA Level 1 Report").

514. The 2015-16 ERA Level 1 Report shows that the National City Facility discharged storm water containing concentrations of iron in excess of NALs during this reporting period. Plaintiffs are informed, believe, and thereon allege that the National City Facility moved to Level 1 status for iron for 2016-17 reporting period.

515. The 2015-16 ERA Level 1 Report failed to conduct any individualized analysis of the National City Facility, nor did it provide any recommendations specific to the National City Facility. This report simply noted the National City Facility's NAL exceedance for iron, noted that forty-two other facilities in the compliance group also exceeded the NAL for iron, and provided generalized recommendations for BMP improvements to address iron NAL exceedances.

516. A Consolidated ERA Level 1 Report for BMI Compliance Group Facilities, which includes the National City Facility, for the reporting period of July 1, 2016 through June 30, 2017, is publicly available via the SMARTS database and dated December 15, 2017 ("2016-17 ERA Level 1 Report").

517. The 2016-17 ERA Level 1 Report shows that the National City Facility discharged storm water containing concentrations of iron and TSS in excess of NAL limits during this reporting period. Plaintiffs are informed, believe, and thereon allege that the National City Facility moved to Level 1 status for TSS, and Level 2 status for iron for 2017-18 reporting period.

518. The 2016-17 ERA Level 1 Report stated that the storm drain inlets at the

National City Facility would be closed off in an attempt to prevent storm water discharges from the facility. This report further noted that the sources of iron and TSS were similar such that improvements to reduce iron concentrations would also reduce TSS. This report failed to identify any BMP improvements and failed to recommend any additional BMPs.

519.  An ERA Level 2 Action Plan for iron for the National City Facility for the reporting period July 1, 2016 through June 30, 2017 is publicly available via the SMARTS database and dated December 14, 2017 ("2016-17 ERA Level 2 Action Plan").

520.  The 2016-17 ERA Level 2 Action Plan explains that National City Facility again discharged storm water containing concentrations of iron in excess of NAL limits, during this reporting period. This Level 2 Report's sole recommendation to prevent additional NALs exceedance at the National City Facility was to "[b]lock off the three (3) storm drain drop inlets to prevent storm water from discharging from the site."

521.  A Consolidated ERA Level 1 Report for BMI Compliance Group Facilities, which includes the National City Facility, for the reporting period of July 1, 2017 through June 30, 2018, is publicly available via the SMARTS database and dated December 18, 2018 ("2017-18 ERA Level 1 Report").

522.  The 2017-18 ERA Level 1 Report explains that the National City Facility discharged storm water containing concentrations of N+N, TSS, and iron in excess of NALs during this reporting period.

523.  An ERA Level 2 Action Plan for TSS and iron for the National City Facility for the reporting period of July 1, 2017 through June 30, 2018 is publicly available via the SMARTS database and dated December 27, 2018 ("2017-18 ERA Level 2 Action Plan").

524.  An ERA Level 2 Technical Report for TSS and iron for the National City Facility for the reporting period of July 1, 2017 through June 30, 2018 is publicly available via the SMARTS database and dated December 27, 2018 ("2017-18 ERA Level 2 Technical Report"). Plaintiffs are informed, believe, and thereon allege that the

National City Facility remained at Level 2 for iron, moved to Level 2 for TSS, and entered Level 1 for N+N for the 2018-19 reporting period.

525.    The 2017-18 ERA Level 1 Report, 2017-18 ERA Level 2 Action Plan, and 2017-18 ERA Level 2 Technical Report collectively recommend a holistic approach to address storm water discharges at the Facility. These reports state that the Facility had built a retaining wall to prevent runoff, sealed off the drop inlets, installed berms at the facility entrances, and implemented a program to bring portable storage tanks to the facility prior to storm events.

526.    Plaintiffs are informed, believe, and thereon allege that the National City Facility continues to discharge pollutants in storm water in exceedance of NALs.

527.    Plaintiffs are informed, believe, and thereon allege that each of the National City Level 1 ERA Reports failed to conduct adequate evaluations to identify the BMPs in the National City Facility's SWPPP that corresponded to each of the NAL exceedances at the Facility.

528.    Plaintiffs are informed, believe, and thereon allege that each of the National City Level 1 ERA Reports failed to conduct adequate evaluations of all drainage areas at the National City Facility.

529.    Plaintiffs are informed, believe, and thereon allege that each of the National City Level 1 ERA Reports failed to identify all industrial activities that were or may have been contributing to NAL exceedances.

530.    Plaintiffs are informed, believe, and thereon allege that each of the National City Level 1 ERA Reports failed to adequately analyze pollutant sources that were or may have been related to NAL exceedances.

531.    Plaintiffs are informed, believe, and thereon allege that each of the National City Level 1 and Level 2 ERA reports failed to identify necessary additional BMPs to prevent future NAL exceedances and comply with the General Industrial Permit at the Facility.

532.    Plaintiffs are informed, believe, and thereon allege that each of the National

City Level 1 ERA reports failed to include adequate summaries of the Level 1 ERA evaluations for the National City Facility.

533.    Because the National City Facility continues to discharge pollutants in its storm water runoff in exceedance of effluent limitations and NAL standards, Plaintiffs are informed, believe, and thereon allege each of the National City Level 1 and Level 2 ERA reports fail to evaluate and identify BMPs that would reduce or prevent NAL exceedances.

### 3.  The Miramar Facility's Violations of ERA Requirements

534.    A Consolidated ERA Level 1 Report for BMI Compliance Group Facilities, which includes the Miramar Facility, for the reporting period of July 1, 2015 through June 30, 2016, is publicly available via the SMARTS database and dated November 30, 2016 ("2015-16 ERA Level 1 Report").

535.    The 2015-16 ERA Level 1 Report establishes that the Miramar Facility discharged storm water containing concentrations of N+N exceeding the NAL during this reporting period.  Plaintiffs are informed, believe, and thereon allege that the Miramar Facility moved to Level 1 status for N+N for 2016-17 reporting period.

536.    The 2015-16 ERA Level 1 Report failed to recommend any improvements to existing BMPs and failed to recommend any additional BMPs.

537.    A Consolidated ERA Level 1 Report for BMI Compliance Group Facilities, which includes the Miramar Facility, for the reporting period of July 1, 2016 through June 30, 2017, is publicly available via the SMARTS database and dated December 12, 2017 ("2016-17 ERA Level 1 Report").

538.    The 2016-17 ERA Level 1 Report shows that the Miramar Facility discharged storm water containing concentrations of N+N, iron, and TSS in exceedance of NALs during this reporting period.  Plaintiffs are informed, believe, and thereon allege that the Miramar Facility moved to Level 1 status for TSS and iron, and Level 2 status for N+N for 2017-18 reporting period.

539.    The 2016-17 ERA Level 1 Report stated that the Miramar Facility "will be

reconstructing the basin at Discharge Point 3 so that it can retain the water generated by an 85th percentile, 24-hour storm event." This report also recommended reconstructing the basin at DP-2.

540.   An ERA Level 2 Action Plan for N+N for the Miramar Facility for the reporting period of July 1, 2016 through June 30, 2017 is publicly available via the SMARTS database and dated December 14, 2017 ("2016-17 ERA Level 2 Action Plan").

541.   The 2016-17 ERA Level 2 Action Plan explains that Miramar Facility again discharged storm water containing concentrations of N+N in excess of NAL limits, during this reporting period. This report also recommends that the Miramar Facility reconstruct and expand its basins at DP-2 and DP-3, while further recommending that the Miramar Facility should conduct testing to better determine the source of N+N at the Facility.

542.   An ERA Level 2 Action Plan for N+N, TSS, and iron for the Miramar Facility for the reporting period of July 1, 2017 through June 30, 2018 is publicly available via the SMARTS database and dated December 27, 2018 ("2017-18 ERA Level 2 Action Plan").

543.   An ERA Level 2 Technical Report for N+N, TSS, and iron for the Miramar Facility for the reporting period of July 1, 2017 through June 30, 2018 is publicly available via the SMARTS database and dated December 27, 2018 ("2017-18 ERA Level 2 Technical Report").  Plaintiffs are informed, believe, and thereon allege that the Miramar Facility remained at Level 2 for N+N, moved to Level 2 for TSS and iron.

544.   Plaintiffs are informed, believe, and thereon allege that the Miramar Facility continues to discharge pollutants in storm water in exceedance of NALs.

545.   Plaintiffs are informed, believe, and thereon allege that the 2015-16 and 2016-17 ERA Level 1 Reports failed to conduct adequate evaluations to identify the BMPs in the Miramar Facility's SWPPP that corresponded to each of the NAL exceedances at the Facility.

546.   Plaintiffs are informed, believe, and thereon allege that the 2015-16 and

2016-17 ERA Level 1 Reports failed to conduct adequate evaluations of all drainage areas at the Miramar Facility.

547.   Plaintiffs are informed, believe, and thereon allege that the 2015-16 and 2016-17 ERA Level 1 Reports failed to identify all industrial activities that were or may have been contributing to the NAL exceedances.

548.   Plaintiffs are informed, believe, and thereon allege that the 2015-16 and 2016-17 ERA Level 1 Reports failed to adequately analyze pollutant sources that were or may have been related to the NAL exceedances.

549.   Plaintiffs are informed, believe, and thereon allege that the 2015-16 and 2016-17 ERA Level 1 Reports, and 2016-17 ERA Level 2 Report failed to identify necessary additional BMPs to prevent future NAL exceedances and comply with the General Industrial Permit at the Facility.

550.   Plaintiffs are informed, believe, and thereon allege that the 2015-16 and 2016-17 ERA Level 1 Reports failed to include adequate summaries of the Level 1 ERA evaluations for the Miramar Facility.

551.   Because the Miramar Facility continues to discharge pollutants in its storm water runoff in exceedance of effluent limitations and NAL standards, Plaintiffs are informed, believe, and thereon allege each of the Miramar Level 1 and Level 2 ERA Reports fail to evaluate and identify BMPs that would reduce or prevent NAL exceedances.

**H.    Unauthorized Non-Storm Water Discharges from the Hanson Facilities in Violation of the General Industrial Permit Discharge Prohibition**

552.   Plaintiffs are informed, believe, and thereon allege the Slaughterhouse Facility has discharged unauthorized non-storm water discharges in violation of the General Industrial Permit. See 1997 Permit § A.1; 2015 Permit § III.B. For example, unauthorized non-storm water discharges occur from the Facility's washing, cleaning, and dust suppression activities.

553.   Plaintiffs are informed, believe, and thereon allege the Slaughterhouse

Complaint                                             90

Owner and/or Operator conducts these activities without adequate BMPs to prevent related non-storm water discharges.

554.   Plaintiffs are informed, believe, and thereon allege the National City Facility has discharged unauthorized non-storm water discharges in violation of the General Industrial Permit. See 1997 Permit § A.1; 2015 Permit § III.B. For example, unauthorized non-storm water discharges can occur from the Facility's dust suppression, truck washing, site cleaning and batch plant washing activities, or from unauthorized spills and leaks from the batch plant and fueling area.

555.   Plaintiffs are informed, believe, and thereon allege the National City Owner and/or Operator conducts these activities without adequate BMPs to prevent related non-storm water discharges.

556.   Plaintiffs are informed, believe, and thereon allege the Miramar Facility has discharged unauthorized non-storm water discharges in violation of the General Industrial Permit. See 1997 Permit § A.1; 2015 Permit § III.B. For example, unauthorized non-storm water discharges can occur from the Facility's dust suppression, truck washing, site cleaning and batch plant washing activities, or from unauthorized spills and leaks from the batch plant and fueling area.

557.   Plaintiffs are informed, believe, and thereon allege the Miramar Owner and/or Operator conducts these activities without adequate BMPs to prevent related non-storm water discharges.

558.   Non-storm water discharges resulting from truck washing, site and batch facility cleaning, dust suppression, and leakage from batch plant and fueling areas do not qualify as authorized non-storm water discharges under the General Industrial Permit.

559.   San Diego Regional Municipal Separate Storm Sewer System (MS4) Permit Section E.2.a. prohibits the discharge of unauthorized non-storm water as an illicit discharge. Wash water is not listed among the authorized non-storm water discharges. See MS4 Permit §§ E.2.a.3-4.

560.   Each time Defendant discharges prohibited non-storm water in violation of

Discharge Prohibition III.B of the Permit is a separate and distinct violation of the Storm Water Permit and section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Plaintiffs will update the number and dates of violations when additional information becomes available. Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since March 27, 2014.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the General Industrial Permit's Effluent Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

561.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

562.    Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators failed and continue to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at each of the three Hanson Facilities.

563.    Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from each of the three Hanson Facilities.

564.    The Hanson Facilities Owners and/or Operators' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at each of the three Hanson Facilities is a violation of the General Industrial Permit and the CWA. See 1997 Permit § B.3; 2015 Permit § I.D.32, V.A; see also 33 U.S.C. § 1311(b).

565.    Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators violated and continue to violate the General Industrial Permit Effluent Limitation each and every time storm water containing levels of

pollutants that do not achieve BAT/BCT standards discharge from each of the three Hanson Facilities.

566.   Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators have been in violation of the General Industrial Permit Effluent Limitation at each of the three Hanson Facilities every day from March 27, 2014 to the present.

567.   Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators' violations of the General Industrial Permit Effluent Limitation and the Clean Water Act are ongoing and continuous at each of the three Hanson Facilities.

568.   The Hanson Facilities Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to adequately develop and/or implement BMPs to achieve BAT/BCT at each of the three Hanson Facilities.

569.   Each day that Defendant operates the Slaughterhouse Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

570.   Each day that Defendant operates the National City Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

571.   Each day that Defendant operates the Miramar Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

572.   Each day that Defendant operates the Slaughterhouse Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations

Guidelines in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

573.   Each day that Defendant operates the National City Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations Guidelines in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

574.   Each day that Defendant operates the Miramar Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations Guidelines in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

575.   By committing the acts and omissions alleged above, the Hanson Facilities Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from March 27, 2014 to the present, at each of the three Hanson Facilities, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

576.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

577.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

WHEREFORE, Plaintiffs pray judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of General Industrial Permit Receiving Water Limitations and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

578.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

579.    Plaintiffs are informed and believe, and thereon allege, that each of the three Hanson Facilities discharge storm water containing levels of pollutants that adversely impact human health and/or the environment.

580.    Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators discharge storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from each of the three Hanson Facilities.

581.    Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from each of the three Hanson Facilities.

582.    Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from each of the three Hanson Facilities.

583.    The Hanson Facilities Owners' and/or Operators' discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the General Industrial Permit and the Clean Water Act. See 1997 Permit §§ C.1-2; 2015 Permit §§ VI.A-B; see also 33 U.S.C. § 1311(b).

584.    Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators violated and will continue to violate the General Industrial Permit Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, discharge from the three Hanson Facilities.

585.    Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators have been in violation of the General Industrial Permit Receiving Water Limitations at each of the three Hanson Facilities every day from

1  March 27, 2014, to the present.

2      586.   Plaintiffs are informed and believe, and thereon allege, that the Hanson

3  Facilities Owners and/or Operators' violations of the General Industrial Permit Receiving

4  Water Limitations and the CWA are ongoing and continuous at each of the three Hanson

5  Facilities.

6      587.   The Hanson Facilities Owners and/or Operators will continue to be in

7  violation of the General Industrial Permit and the CWA each and every time storm water

8  containing levels of pollutants that adversely impact human health and/or the

9  environment, and/or that cause or contribute to exceedances of WQSs is discharged from

10  the Hanson Facilities.

11      588.   Each day that Defendant has discharged and/or continues to discharge

12  polluted storm water from the Slaughterhouse Facility in violation of the General

13  Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33

14  U.S.C. § 1311(a).

15      589.   Each day that Defendant has discharged and/or continues to discharge

16  polluted storm water from the National City Facility in violation of the General Industrial

17  Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. §

18  1311(a).

19      590.   Each day that Defendant has discharged and/or continues to discharge

20  polluted storm water from the Miramar Facility in violation of the General Industrial

21  Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. §

22  1311(a).

23      591.   By committing the acts and omissions alleged above, the Hanson Facilities

24  Owners and/or Operators are subject to an assessment of civil penalties for each and

25  every violation of the CWA occurring from March 27, 2014, to the present, from each of

26  the three Hanson Facilities, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C.

27  §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

28      592.   An action for injunctive relief under the Clean Water Act is authorized by

Complaint                                96

Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

593.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendant as set forth hereafter.

## THIRD CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the General Industrial Permit and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

594.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

595.   Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators have failed and continue to fail to develop and/or implement an adequate SWPPP for the each of the three Hanson Facilities.

596.   Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators have failed and continue to fail to adequately revise the SWPPPs for the each of the three Hanson Facilities.

597.   Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators conduct operations at the each of the three Hanson Facilities each day without an adequately developed, implemented, and/or revised SWPPP.

598.   The Hanson Facilities Owners and/or Operators' failure to adequately develop, implement, and/or revise a SWPPP for each of the three Hanson Facilities is a violation of the General Industrial Permit and the Clean Water Act. See 1997 Permit § A; 2015 Permit § X; see also 33 U.S.C. § 1311(b).

599.   Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators have been in violation of the General Industrial

Permit SWPPP requirements at each of the three Hanson Facilities every day from March 27, 2014, to the present.

600. Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators' violations of the General Industrial Permit SWPPP requirements and the CWA at each of the three Hanson Facilities are ongoing and continuous.

601. The Hanson Facilities Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day the they fail to adequately develop, implement, and/or revise the SWPPPs for each of the three Hanson Facilities.

602. Each day that Defendant operates the Slaughterhouse Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a).

603. Each day that Defendant operates the National City Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a).

604. Each day that Defendant operates the Miramar Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a).

605. By committing the acts and omissions alleged above, the Hanson Facilities Owners and/or Operators is subject to an assessment of civil penalties for each and every violation of the CWA occurring from March 27, 2014, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

606. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

607. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

Complaint                                          98

an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray for judgment Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and Revise a Monitoring and Reporting Plan in Violation of the General Industrial Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

608.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

609.    Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators have failed and continue to fail to develop and/or implement an adequate M&RP for each of the three Hanson Facilities.

610.    Plaintiffs are informed and believe, and thereon allege, that Hanson Facilities Owners and/or Operators have failed and continue to fail to adequately revise the M&RPs for each of the three Hanson Facilities.

611.    Plaintiffs are informed and believe, and thereon allege, that Hanson Facilities Owners and/or Operators conducts operations at each of the three Hanson Facilities each day without an adequately developed, implemented, and/or revised M&RP.

612.    The Hanson Facilities Owners and/or Operators' failure to adequately develop, implement, and/or revise a M&RP for each of the three Hanson Facilities is a violation of the General Industrial Permit and the Clean Water Act. See 1997 Permit §B; 2015 Permit § XI; see also 33 U.S.C. § 1311(b).

613.    Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators have been in violation of the General Industrial Permit M&RP requirements at each of the three Hanson Facilities every day from March 27, 2014, to the present.

614.    Plaintiffs are informed and believe, and thereon allege, that the Hanson

Facilities Owners and/or Operators' violations of the General Industrial Permit M&RP requirements and the CWA at each of the three Hanson Facilities are ongoing and continuous.

615. The Hanson Facilities Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to adequately develop, implement, and/or revise the M&RP for each of the three Hanson Facilities.

616. Each day that Defendant operates the Slaughterhouse Facility without developing, implementing, and/or revising an adequate M&RP for that facility is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. §1311(a).

617. Each day that Defendant operates the National City Facility without developing, implementing, and/or revising an adequate M&RP for that facility is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. §1311(a).

618. Each day that Defendant operates the Miramar Facility without developing, implementing, and/or revising an adequate M&RP for that facility is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. §1311(a).

619. By committing the acts and omissions alleged above, the Hanson Facilities Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from March 27, 2014, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

620. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

621. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendant as set forth hereafter.

# FIFTH CAUSE OF ACTION

## Failure to Report as Required in Violation of the General Industrial Permit and the Clean Water Act.

## 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

622.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

623.    Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators have failed and continue to fail to submit accurate and/or complete Annual Reports for each of the three Hanson Facilities.

624.    The Hanson Facilities Owners and/or Operators' failure to submit complete and accurate Annual Reports is a violation of the General Industrial Permit and the Clean Water Act. See 1997 Permit §§ B.14, C.9-10; 2015 Permit § XVI; see also 33 U.S.C. § 1311(b).

625.    Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators conduct operations at each of the three Hanson Facilities each day without reporting as required by the General Industrial Permit.

626.    Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators have been in violation of the General Industrial Permit's reporting requirements every day since at least March 27, 2014.

627.    Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators' violations of the reporting requirements of the General Industrial Permit and the CWA are ongoing and continuous at each of the three Hanson Facilities.

628.    The Hanson Facilities Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to comply with the General Industrial Permit reporting requirements at each of the three Hanson Facilities.

629.    Each and every violation of the General Industrial Permit reporting

requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

630.   By committing the acts and omissions alleged above, the Hanson Facilities Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from March 27, 2014, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

631.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

632.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendant as set forth hereafter.

## SIXTH CAUSE OF ACTION

**Failure to Properly Monitor in Violation of the General Industrial Permit**

633.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

634.   Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators have failed and continue to fail to conduct the requisite visual observations of storm water discharges at each of the three Hanson Facilities.

635.   The Hanson Facilities Owners and/or Operators' failure to conduct the requisite visual observations at each of the three Hanson Facilities is a violation of the General Industrial Permit and the CWA. See 1997 Permit §§ B.3-4; 2015 Permit § XI.A; see also 33 U.S.C. § 1311(b).

636.   Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators have failed and continue to fail to collect and analyze the required number of storm water samples at each of the three Hanson Facilities.

637.   The Hanson Facilities Owners and/or Operators' failure to collect and analyze the required number of storm water samples at each of the three Hanson Facilities is a violation of the General Industrial Permit and the CWA. See 1997 Permit §§ B.5.a-b, 2015 Permit §§ XI.B.1-3; see also 33 U.S.C. § 1311(b).

638.   Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators have failed and continue to fail collect samples from each discharge location at each of the three Hanson Facilities.

639.   The Hanson Facilities Owners and/or Operators' failure to collect samples from each discharge location at each of the three Hanson Facilities is a violation of the General Industrial Permit and the CWA. See 1997 Permit § B.7; 2015 Permit §§ XI.B.4-5; see also 33 U.S.C. § 1311(b).

640.   Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators have failed and continue to fail analyze all collected samples for all required parameters at each of the three Hanson Facilities.

641.   The Hanson Facilities Owners and/or Operators' failure to analyze all collected samples for all required parameters at each of the three Hanson Facilities is a violation of the General Industrial Permit and the CWA. See 1997 Permit §§ B.5.c, B.6; 2015 Permit §§ XI.B.6, XI.D; see also 33 U.S.C. § 1311(b).

642.   Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators have failed to comply with the General Industrial Permit's monitoring requirements at each of the three Hanson Facilities since March 27, 2014.

643.   Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators' violations of the General Industrial Permit monitoring requirements and the Clean Water Act are ongoing and continuous at each of the three Hanson Facilities.

644.   The Hanson Facilities Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to

comply with the General Industrial Permit's monitoring requirements at each of the three Hanson Facilities.

645.    Each and every violation of the General Industrial Permit's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

646.    By committing the acts and omissions alleged above, the Hanson Facilities Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from March 27, 2014, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

647.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

648.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendant as set forth hereafter.

## SEVENTH CAUSE OF ACTION

### Failure to Comply with ERA Requirements in Violation of the General Industrial Permit and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

649.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

650.    Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators have failed and continue to fail to conduct an adequate Level 1 status evaluation for the each of the three Hanson Facilities.

651.    Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators have failed and continue to fail to submit an adequate

Level 1 ERA Report for each of the three Hanson Facilities.

652.   Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators conduct operations at each of the three Hanson Facilities each day without conducting an adequate Level 1 Evaluation and/or without submitting an adequate Level 1 ERA Report.

653.   Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators' failure to conduct an adequate Level 1 Evaluation and/or failure to file an adequate Level 1 ERA Report is a violation of the General Industrial Permit. 2015 Permit, Section XII(C).

654.   Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators have been in daily and continuous violation of the General Industrial Permit Level 1 status Evaluation requirements every day since at least October 1, 2016 for each of the three Hanson Facilities.

655.   Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators have been in daily and continuous violation of the General Industrial Permit Level 1 status ERA reporting requirements every day since at least January 1, 2017.

656.   The Hanson Facilities Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day the Hanson Facilities Owners and/or Operators fails to comply with the Level 1 ERA requirements at each of the three Hanson Facilities.

657.   Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators violations of the Level 1 ERA requirements of the General Industrial Permit and the CWA are ongoing and continuous.

658.   Every day the Hanson Facilities Owners and/or Operators conduct operations at the Slaughterhouse Facility without conducting an adequate Level 1 status evaluation and/or a without submitting an adequate Level 1 ERA Report, is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean

Water Act, 33 U.S.C. §1311(a).

659.   By committing the acts and omissions alleged above, the Hanson Facilities Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the Level 1 status Evaluation requirements occurring from October 1, 2016, to the present, and for each and every violation of the Level 1 ERA Report requirements occurring from January 1, 2017, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

660.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

661.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendant as set forth hereafter.

## EIGHTH CAUSE OF ACTION

### Discharges of Unauthorized Non-Storm Water in Violation of the General Industrial Permit and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

662.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

663.   Plaintiffs are informed and believe, and thereon allege, that prohibited non-storm water discharges have discharged and continue to discharge from the each of the three Hanson Facilities.

664.   The Hanson Facilities Owners and/or Operators' failure to prevent unauthorized non-storm water discharges is a violation of the General Industrial Permit and the CWA. 1997 Permit § A.1; 2015 Permit § III.B; 33 U.S.C. § 1311(a).

665.   Plaintiffs are informed and believe, and thereon allege, that the Hanson Facilities Owners and/or Operators violated and will continue to violate the General

1 Industrial Permit Discharge Prohibition each and every time unauthorized non-storm
2 water discharges from each of the three Hanson Facilities.

3       666.   Plaintiffs are informed and believe, and thereon allege, that the Hanson
4 Facilities Owners and/or Operators have been in violation of the General Industrial
5 Permit Discharge Prohibition at each of the three Hanson Facilities every day from
6 March 27, 2014, to the present.

7       667.   Plaintiffs are informed and believe, and thereon allege, that the Hanson
8 Facilities Owners and/or Operators' violations of the General Industrial Permit are
9 ongoing and continuous.

10      668.   Each and every violation of the General Industrial Permit Discharge
11 Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C.
12 § 1311(a).

13      669.   By committing the acts and omissions alleged above, the Hanson Facilities
14 Owners and/or Operators are subject to an assessment of civil penalties for each and
15 every violation of the CWA occurring from March 27, 2014, to the present, pursuant to
16 Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

17      670.   An action for injunctive relief under the CWA is authorized by 33 U.S.C.
18 § 1365(a). Continuing commission of the acts and omissions alleged above would
19 irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate
20 remedy at law.

21      671.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because
22 an actual controversy exists as to the rights and other legal relations of the Parties.

23            WHEREFORE, Plaintiffs pray judgment against Defendant as set forth hereafter.
24 /././
25 /././
26 /././
27 /././
28 /././

## VII.    RELIEF REQUESTED

672.    Plaintiffs respectfully request that this Court grant the following relief:

a.    A Court order declaring the Defendant to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Hanson Facilities in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include BAT/BCT requirements, for failing to meet receiving water limitations, and for failing to comply with the substantive and procedural requirements of the General Industrial Permit;

b.    A Court order enjoining Defendant from discharging pollutants without a NPDES permit;

c.    A Court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the General Industrial Permit and the Clean Water Act;

d.    A Court order assessing civil monetary penalties for each violation of the CWA at $37,500.00 per day per violation for all CWA violations after January 12, 2009, and $54,833.00 per day per violation for violations that occurred after November 2, 2015, as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

e.    A Court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

/././

/././

/././

/././

/././

/././

1     f.      Any other relief as this Court may deem appropriate.

2  Dated: March 27, 2019

3                                        Respectfully submitted,

4                                        COAST LAW GROUP LLP

5                                        By: s/Livia B. Beaudin
6                                        LIVIA B. BEAUDIN
7                                        Attorney for Plaintiffs
                                         COASTAL ENVIRONMENTAL
8                                        RIGHTS FOUNDATION
9                                        E-mail: livia@coastlawgroup.com

10

11                                       SAN DIEGO COASTKEEPER

12

13                                       By: s/Matt O'Malley
                                         MATT O'MALLEY
14                                       Attorney for Plaintiffs
                                         SAN DIEGO COASTKEEPER
15                                       E-mail: matt@sdcoastkeeper.org

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint                        109